UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   JAN 1 2 2007   ★

------------------------------------------------------------------------X

MICHAEL T. DOLAN
Plaintiff,

LONG ISLAND OFFICE
**AMENDED COMPLAINT**
**03-CV-3285 (DRH) (MLO)**
**Dolan –v- Fairbanks Capital Corp.;**
**PMI Mortgage Insurance Company**

v.


FAIRBANKS CAPITAL CORP., a Utah corporation,
And;
PMI Mortgage Insurance Company, Walnut Creek, CA.,
Defendants.

------------------------------------------------------------------------X

State of New York) ss.
County of Suffolk)

## COMPLAINT UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT & CLAIMS OF ANTITRUST VIOLATIONS
## JURY TRIAL DEMANDED

1.  I, Michael T. Dolan, Plaintiff, pro se, non-attorney, believe the following to be true and annex amended complaint:

2.  Fairbanks Capital Corp (FCC) and PMI Mortgage Insurance Company (PMI) are the defendants in the above captioned title.

3.  In accordance with the Courts Order dated December 15, 2006, plaintiff was given leave to file the amended complaint to comply with Federal Civil Procedure Rule 9(b) to specifically identify any statement, whether oral or in writing, which is based on the RICO fraud claims; to allege where and when the statement(s) were made, and identify which defendant made the statement(s); and attach any relevant documents in this regard directly to the pleading.

-1-

# Table of Contents

Defendant-FCC "Frauds".........................Page 2

Defendant-PMI "Frauds".......................Page 11

Credit Report – used to lock-in Plaintiff......Page 18

The "Smoking Gun" – IRS form 1099A.....Page 21

CONCLUSION................................Page 26

<u>Table of Authorities</u>

Statutes & Case(s) law

<u>Statutes:</u>

RICO.............Title 18 U.S.C. section 1962, Section 1961(1), Section 1961(1)(B),

Section 1961(5), section 1961(6)(B)


Mail Fraud........Title 18 U.S.C. //1961(1), section 1341

Wire Fraud.......Title 18 U.S.C. //1961(1),section 1343

Anti-Trust Act..Section 2 of the Sherman Act

Fair Debt Collections Practices Act.............Title 15 U.S.C. Section 1692e,

Sec. 1692k, Sec 1692b, sec.1692a(6), sec.1692a(6)(A), sec.1692a(6)(F)(iii).


TILA....................Title 15 U.S.C. Section 1601 et.seq., 12 C.F.R. section 226.20(c).

McCarren Feguson Act

( ii )

Case(s) law and filings:

- Attached annexed 3rd amended Complaint to proper previous filings where appropriate.
- *McEachin v. McGinnis*, 357 F.3d 197, 200 (2d Cir.2004)
- *Attorney General of Canada v R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir. 2001)(quoting S.Rep.No 91-617, at 76 (1969).
- *Delfalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001), at 313.
- *Pinnacle Consultants, Ltd. v Leucadia Nat'l Corp.*, 101 F.3d 900, 904 (2d Cir. 1996)(quoting 18 U.S.C.//1962).
- *GICC Capital Corp. v. Technology Fin. Group, Inc.*, 67 F.3d 463, 465 (2d Cir. 1995).
- *U.S. v. Radonjich*, 1F.3d 117, 118 (2d Cir. 1993).
- *Jennings v. Emry*, 910 F.2d 1434, 1438 (7th Cir. 1990).
- *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999)
- *Mills v. Polar Molecule Corp.*, 12 F.3d 1170 (2d Cir. 1993)
- *Schwab v. Philip Morris USA, Inc.*, 449 F.Supp 2d 992, 1038(E.D.N.Y.2006).
- *Bently v. Great Lakes Collection Bureau, 6 F.3d 60, 62 (2d Cir. 1993)*
- *TMS Mortgage, Inc., d/b/a The Money Store v. Michael T. Dolan*, Index No. 26575-01 (Sup.Ct. Suffolk County 2005)(Willen,JHO)(court finding FCC used false and deceptive means to collect Plaintiff's debt).
- *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 461-62 (1962).
- *Jefferson Parish Hosp. Dist. No. 2 v. Hyyde*, 466 U.S. 2, 12 (1984).
- *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 126 S. Ct. 1281 (2006)
- *In re Visa Check/Matermoney Antitrust Litig.*, 280 F.3d 124, 134 n.5 (2d Cir. 2001).
- *Balaklaw v. Lovell*, 14 F.3d 793, 798 n.9 (2d Cir. 1994).at 797.
- *(quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977))
- *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.* 996 F.2d 537, 543 (2d Cir. 1993)
- *Associated General Contractors of Cal. Inc., v. California State Council of Carpenters*, 459 U.S. 519, 537-44 (1983).
- *Twombley v. Bell Atl. Corp.*, 425 F.3d 99, 112, (2d Cir. 2005)
- *United States Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)
- *Spectrum Sports Inc., v McQuillan*, 506 U.S. 447, 456 (1993).
- *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998).
- Cherry v. Amoco Oil Co., 490 F. Supp 1026 (1980,ND Ga.)
- Vander Missen v. Kellogg-Citizens Nat. Bank (1979, ED Wis.) 83 FRD 206, 28 FR Serv 2d 563.

4. Also, the Court dismissed Plaintiff's FDCPA cause of action for not stating plainly that plaintiff's mortgage was in fact in default in 11/2000` when Fairbanks Capital Corp. acquired servicing rights and servicing of the loan on 11/22/00 started, and gave leave to restate FDCPA claims. Plaintiff, plainly states the loan was in default and was in the TMS forbearance agreement attempting to restore my mortgage with TMS, when FCC took over the servicing on 11/22/00. Plaintiff has attached the August 2000` forbearance agreement with TMS (The Money Store), and money order checks that were paid to TMS October 21,2000 and paid to FCC for, November 22, 2000 and December 2000, with other documents to show when Fairbanks acquired plaintiff's loan.(Exhibit-1). FCC collected for TMS and received the loan and forbearance payments and knew the loan was in default, and treated the loan as in default. FCC serviced the loan as a Debt Collector, and violated the statutes under the FDCPA.

**5.  Defendant-FCC "Frauds"**

6. FCC with PMI, used "loan sharking and extortion" in conjunction with "mail & wire fraud" predicates to take Plaintiff's money and property, violating the RICO statutes of, Title 18 U.S.C. section//1962. Each payment made by Plaintiff was sent by mail to FCC represented the loan-sharking and extortion payments that came from the racketeering activities operated by FCC. FCC violated 18 USC//1341,1343wire fraud.

7. FCC claimed that Plaintiff owed substantial arrears on his mortgage loan. The TMS Forbearance Agreement dated 8/11/00 was in-force at the time of the transfer to FCC on 11/22/00, and Plaintiff paid the monthly extortion payments of $4,680.59 to FCC beginning in November 2000`. (Exhibit-2).

The forbearance agreements were the instruments used to extort payments from Plaintiff for the racketeering "RICO Enterprise." FCC accepted payments, refused to review accounting of Plaintiff's mortgage loan when Plaintiff requested at the transfer or at anytime during their 31 months of servicing. (Ex-3, Fax to FCC 12/00', w/ltr.4/10/01decline). FCC did not apply Plaintiff's payments to the mortgage. FCC did not apply Plaintiff's November 22, 2000 payment to the note and mortgage, did not apply Plaintiff's December 2000' payment to the mortgage or pay the real estate taxes due December 1, 2000 and failed to notify Plaintiff. (Exhibit-4 FAX to FCC w/Suffolk County Notice 12/18/01, and Exhibit-9 FCC Escrow statement 10/03'). FCC continued the extortion of Plaintiff by demanding and accepting each payment, enforcing the forbearance agreement demands to pay the false arrears. Demanded payment by use through the mail and threatening Plaintiff over the phone, "to pay them or FCC will foreclose on you and sell your house."

8.  When Plaintiff could no longer make the extortion payments FCC drafted another Forbearance Agreement dated 9/24/02 (Exhibit-5, attached to ex-7),and forced Plaintiff to pay into it. These arrears were created by FCC and enforced through the forbearance agreement. The arrears and threat of foreclosure were used by FCC as the impetus to extort money from Plaintiff and were used to take Plaintiff's money and property through fraud in a foreclosure action and were used to generate ill-gotten gains from the racketeering activities for the RICO enterprise. The arrears were demanded and collected from Plt before and after the property was foreclosed on and resold by FCC.

9.  The FCC forbearance agreement was sent to DOLAN by FAX and mailed. DOLAN signed and returned the agreement with payments to FCC. The $87,567.71 of arrears that FCC claimed in the agreement that Plaintiff owed, was a complete falsehood. -3-

10. Plaintiff paid the $15,000.00 (Exhibit-6) extortion payments to FCC that was demanded through the forbearance agreement on 9/24/02.(Exhibit-5). DOLAN had to sign and pay the money or FCC would foreclose on him. In the "re-made 2nd, Affirmation in Opposition-dated 12/3/03" (Exhibit-7) by Jordan S. Katz-FCC counsel, with the attached FAIRBANKS CAPITAL CORP., September 24,2002 Forbearance Agreement (Ex-5), it reads on page 2 of the agreement at #8:

"*8. DOLAN acknowledges that it is indebted to (Fairbanks) in the with arrears in the sum of $87,567.71.*"

This was false. DOLAN was forced to pay or FCC would foreclose. The statements in the forbearance agreement 9/24/02, confirmed the communications that were made by FCC prior to the foreclosure, and to what FCC demanded from Plaintiff, in the way of money or else I would be foreclosed on. And the demands were based on these fraudulent $87,567.71 of arrears claimed by FCC, that Plaintiff owed. These were later found by the New York State Supreme Court, to be baseless arrears, with nothing in the record to support the FCC claims.

11. The false statements and demands by FCC were made continuously through FCC's customer service representatives (CSR) to Plaintiff. The CSR's demanded Plaintiff pays the amounts each month or FCC would foreclose him on. The FCC customer service representatives refused to give Plaintiff an accurate accounting of his loan. The 2003' FTC and HUD investigations established that FCC actually trained the customer service representatives to NOT give out accurate information to the homeowners such as Plaintiff, to instead give out false information such as the $87,567.71 in arrears and demand payments.                    - 4 -

12. The "1ˢᵗ submitted Affirmation in Opposition-dated 7/30/03 (Exhibit-8) by Jordan Katz-FCC counsel," shows how inaccurate and abusive FCC was to Plaintiff, their intent and how they used false information to carry out the extortion to accomplish their goals of taking Plaintiff's money and property, as an example it states on page 2, at #11:

> *"11. The within action was brought by plaintiff as a direct result of DOLAN's failure to make the required monthly mortgage payments **from and after October 1, 2000.** DOLAN offers no defense to this delinquency and no evidence, newly discovered or otherwise, to counter any of FCC (Fairbanks Capital Corp.) claims. The only result that the court must come to is that DOLAN's ability to live rent free in the mortgaged premises for almost three (3) years is over."*

This was false. The statements used by the Fairbanks Capital Corporation representative-counsel, confirm and document the **type of communications** FCC made and used, on Plaintiff, during and after the foreclosure to take his money and property. These were later proven to be untrue statements made by FCC in the NYS Supreme Court trial. FCC had used these false statements to obtain an <u>unjustified judgement of foreclosure and sale</u> against plaintiff through NYS Supreme Court prior to the trial.

13. FCC used the frauds to carry out the racketeering activities of the defendant's "enterprise." Extortion is robbery with consent. Consent is given because you are being forced to pay, not because you want to. You are being forced to pay what FCC wanted or you would lose your home as well as your reputation and would be left <u>immediately</u> in total financial ruins. You are pinned down financially by FCC's control and hold over your finances. FCC had the ability to mark your credit history in a derogatory way and did, while you were held down by the real threat that FCC

could and would foreclose on you at will, at anytime, if you didn't comply. Part of you held out hope that if you met FCC's demands, you could get out of this. FCC told me we could work it out, but I would have to pay first or else. FCC refused to review the account. FCC did not properly credit payments or properly adjust the interest rate on loan. FCC misrepresented forbearance agreements would cure default. FCC misrepresented the amounts due and Plaintiff relied on FCC representations and paid the extortion payments to FCC or would lose his home and business. FCC extorted money from Plaintiff by using the Forbearance Agreements to extract usurious payments from Plaintiff under the threat of foreclosure. That in effect, put a stranglehold on Plaintiff's finances, from the negative entries applied as delinquencies and the unjustified foreclosure that were put onto his credit report by FCC. FCC calculated the fabricated forbearance arrears by multiplying usurious rate on all charges and added to the mortgage loan, inflating costs. FCC then kept Plaintiff's payments, in completion of the loan-sharking and extortion frauds. As noted, the TMS forbearance agreement dated 8/11/00 documents payments of $4,680.59 made to FCC beginning 11/22/00. FCC did not apply payment to Plaintiff's note and mortgage. Plaintiff paid FCC $4,680.59 for December 2000' mortgage payment and Defendant didn't pay Plaintiff's real estate taxes to Suffolk County that were due December 1, 2000', or apply the payment to the mortgage in December. The FCC escrow statement completely omitted December 2000', all of this had a negative impact on Plaintiff's mortgage amortization, escrow and default status, it affected his credit reports and injured Plaintiff. (Exhibit-9 FCC Escrow Statement dated 10/03').

-6-

These loan servicers were willful and abusive without regard of the consequences to homeowners, lenders or investors.

14. Plaintiff filed complaints with the **New York State Department of Banking and the New York State Office of Attorney General.** FCC responded to the <u>New York State Department Banking inquiry on 11/10/03</u> (Ex-10), which included a simplistic excel manufactured spreadsheet, Key Loan Transaction statement (KLT); and FCC responded to <u>Office of Attorney General inquiry on 8/28/03</u> (Exhibit-11), included a 17 page loan activity statement. Fairbanks Capital Corp., responded to these complaint-inquiries, months after the foreclosure of my home was already completed. FCC refused all of my requests to the accounting of the loan prior to the foreclosure sale. Both of these documents are filled with false statements. Plaintiff used these documents to rebut FCC's claims in the New York State Supreme Court, trial held February 1,14, 2005 to reverse the foreclosure. This (2) FCC loan statements, had irreconcilable differences and were not accurate. The FCC statements were used after the fact, to try and explain away conflicting facts that pointed to the frauds in an attempt to cover up the racketeering activities of the enterprise.

15. Fairbanks prepared the false statements to use as a defense of their actions in the New York State Supreme Court. For example, Fairbanks claimed in the August 28, 2003 letter, addressed to the NYS Office of the Attorney General, that, *"At the time of the transfer Dolan was 32 months delinquent."* That represented more than the <u>entire time</u> that Fairbanks serviced my loan. Fairbanks serviced my loan from 11/22/00 to 5/30/03, which **totaled less than 31 months.** The statement that we were 32 months

-7-

delinquent was not true. FCC said this to cover up the frauds in servicing, and try to degrade and destroy Plaintiff's credibility by slander to throw off authorities. It was meant to rip Plaintiff's reputation apart and to dissuade authorities from pursuing Plaintiff's complaints and was correlated with the FCC counsel's, "1st Affirmation in Opposition dated 7/30/03." FCC made these comments and testified to them in the New York State Supreme Court and sent them in writing to the New York State Attorney General. The FCC home-office expert-witness and the local FCC representatives both repeated the fraudulent claims in trial and were proven untrue.

The FCC Forbearance Agreement dated 9/24/02; the FCC (2) Affirmation in Opposition documents 7/30/03 & 12/03/03, and the (2) FCC responses to the New York State Supreme Court and Agencies, were used to try and justify the fraudulent foreclosure and cover-up the fraud. (Exhibits-5,8,710,11).

16. The FCC response to the New York State Office of Attorney General had attached a convoluted Fairbanks-customer account loan activity statement. This "manipulated loan statement," is another example of the deception employed by FCC, it's an "incomplete" accounting statement that abruptly ends on page 17, and only ran from 01/01 to 08/03, and it did not include NOVEMBER 2000' or DECEMBER 2000' activity.

Regardless, what it does show on page 1, is the payment due date of 11-17-00, which indicates on the FCC system, that the loan was in a default status at the time of the transfer and the FCC system identified the status. More importantly, it documents that FCC was not applying Plaintiff's payments to the mortgage. FCC tried to claim that

-8-

payments weren't made for 32 months. Plaintiff submitted mortgage checks and proved the FCC claims were untrue. FCC tried to reconfigure their statements to mirror the one sent to the New York Department of Banking with the "re-made 2nd Affirmative in Opposition dated 12/3/03" but this failed.

17. Fairbanks Capital Corp., did not set up Plaintiff's loan properly, nor wanted to as a "Predatory Loan Servicer" and continued to use bogus numbers to extract money from the account and demanded payments from Plaintiff through CSR's for the enterprise in patterns of racketeering activity.

18. In the "re-made 2nd Affirmation in Opposition-dated 12/3/03 by Jordan S. Katz-FCC counsel," with the attached FAIRBANKS CAPITAL CORP., September 24, 2002, Forbearance Agreement.(Ex-5). The FCC-Forbearance states on page 2, and reads at #6:

> "6. MICHAEL T. DOLAN AND DONNA M. DOLAN have failed, neglected and refused to comply with the provisions of the NOTE and MORTGAGE by failing to make and pay the installment of principal and interest due and owing **October 17, 2000** and thereafter, despite due demand therefor. Said default has continued for more than fifteen (15) days after due date thereof."

Again this was not true. The **October 17, 2000** date, though, is an admission by FCC that they were not applying Plaintiff's payments. It showed the October 17, 2000 date because FCC was not applying payments to the mortgage onto the system. It also showed that they were then entering the stolen payments as false delinquencies on my credit report every month. It clearly shows the default status on the loan at the time of the loan transfer from TMS to Fairbanks Capital Corp., on 11/22/00, that FCC denied in the instant case. This confirms that FCC had knowledge the loan was in default all along and treated the loan as in default, making <u>FCC a the debt collector</u> that is subject to the FDCPA. These statements reveal the fact that FCC was keeping Plaintiff's payments and marking his credit report delinquent, intentionally.          -9-

The above 2nd statement by their counsel also conflicted with the 17 page-FCC loan activity statement that was sent to the New York State Office of Attorney General. These misleading statements reaffirms how FCC was attempting to cover up and shows how they did not apply Plaintiff's payments at all. Plaintiff paid approximately, $70,000.00 into these forbearance agreements. FCC claimed Plaintiff was 32 months late because they did not apply payments to the mortgage, that's why they didn't show up on the system. FCC did not want to admit that they were not paying the lenders. That's why FCC stated, Plaintiff didn't pay and created loan statements afterwards to try and backup their story. Fairbanks did not have complete records on the servicing history of the loan and could not get them from the previous loan servicers. FCC could not validate the accounting accuracy of the loan. Defendants could not make accurate accounting of Plaintiff's loan in the New York State Supreme Court trial.

19. FCC claimed that Plaintiff didn't make any payments, and said that the Court should find that, *"his ability to live rent free for three years was now over."* This was a diversion, all parties were motivated for different reasons. Plaintiff documented $70,000.00 in payments he made by money-order checks during this time. FCC admitted that they could not account for loan servicing prior to 11/22/00 yet, still tried to persuade that he was (32) months behind just the same. This was not believable or true.

20. FCC produced these loan statements after copies of Plaintiff's checks had been provided to the Court by Plaintiff, who submitted checks as proof of payments in

-10-

an emergency injunction motion filed in July & August 2003 against FCC in New York State Supreme Court. Plaintiff used these to eventually reverse the action.

FCC used the copies of Plaintiff's checks to try and reconfigure FCC statements to match up the conflicting entries, after the fact.

21. FCC tried but could not explain away the frauds. For an example, the KLT did not include the November 2000' payment at the beginning of the loan servicing. In June 2001, FCC charged Plaintiff $1,099.00 for insurance, then deducted monthly insurance charges again for July and thereafter double-charging Plaintiff. The FCC statements were unreliable when they were sent. The December 2002 monthly FCC statement shows erratic double hits for insurance deductions. (Ex-5, KLT )( Ex- 12, FCC 2002').

22. The response to New York Office of Attorney General inquiry, included the 17 page-FCC activity loan statement, which does not show any activity for the original transfer time period when loan servicing began, in other words, no loan activity for the first day or month of servicing, it shows a start date of 11/17/00 on it.

23. FCC with PMI intentionally created arrears to take Plaintiff's money and property through patterns of racketeering activities for the association-in-fact "Enterprise."

**24. Defendant-PMI "Frauds"**

25. PMI used FCC, associated, to carry out racketeering activities through loan servicing. And FCC used PMI for insurance and together operated the RICO enterprise. FCC sent a portion of the extortion payments to PMI disguised as insurance premiums. FCC collected payments of $4,680.59 from Plaintiff beginning 11/22/00 through July 01'. FCC collected $15,000.00 on 9/24/02' from Plaintiff while claiming that Plaintiff

-11-

owed $87,567.71 of arrears. FCC sent to PMI and PMI received and used part of Plaintiff's payments collected on the fraudulent arrears. PMI participated with FCC in patterns of racketeering against Plaintiff. PMI reinvested proceeds made from the racketeering activities back into FCC by purchasing more FCC stocks, and reciprocated gains to FCC for the "RICO enterprise" to acquire more mortgage loans.

26. PMI generated profits that turned into enormous dividends from the frauds, such as controlling the default loss ratios of insurance risks they insured, through the RICO enterprise's control over the loan servicing on mortgages they insured and serviced together. Dividends are a return of profits after expenses are paid. PMI benefited by knowing in advance of potential losses on insurance risks and by controlling the loan servicing conditions through the enterprise to effect the outcome in their favor. This allowed PMI to "knowingly dump" potential higher risks before incurring claims onto other unsuspecting investors by transferring loans and avoiding losses. This activity enhanced PMI's dividend to shareholders, as well as, FCC's standing as loan servicer.

27. Transferring loans is a common practice in the residential mortgage loan industry that PMI insured. PMI took unfair advantage of these practices through the enterprise's control of loan servicing with FCC and abused these practices by transferring loans after extorting payments from homeowners with fraudulent overcharges. These included insurance premium overcharges in the claimed arrears taken from Plaintiff.

28. Defendants FCC & PMI generated income from the racketeering activities by charging and collecting larger premiums for default and force-placed insurance products, forced onto loans such as Plaintiff's. Defendants' charged larger premiums

-12-

based on higher sub-prime risk rates, without the real risk of loss or default exposure on the mortgage loan's, this developed higher profits for the Defendants. This created higher profits without the risk of loss because of the fraudulent racketeering activities that were used to control servicing of the loans and used to apply overcharges through loan sharking, and collections through extortion. Defendts shared the ill-gotten gains.

29. Through loan servicing the enterprise controlled the risks and could extort money from Plaintiff <u>until</u> Defendants transferred or sold loans, well before a claim occurred. PMI, known for overcharging on title insurance in the past, substituted higher rates on lower risk products soaking homeowners on coverage, such as Plaintiff. (SEC 2003' 10k report & class civil suit-Plaintiff, APTIC a subsidiary Title Insurance Co. of PMIG sued for overcharging homeowners between 50 to 70% higher than allowed by law on refinances.) (Ex-13 & 14)

30. Plaintiff's loan was sold, held and then transferred on 7/1/03 from FCC to Wilshire the new loan servicer. The July date is a popular issue date for most of the 6 month forced-placed insurance policies, that are used in the industry. Together, FCC and PMI transferred selected loans and disguised some potential losses with Plaintiff's loan on the 7/1/03-issue date. Defendants-PMI & FCC transferred the mixed in "seasoned" loans, to unload these loans onto other servicers and/or insurance companies to get off the risks or <u>cashed in</u>, as they did on Plaintiff. Loans are bundled and resold all the time. This control of the loan servicing process was extremely lucrative to PMI and generated a $100,000,000.00 corporate dividend to the parent company in 2003'. PMI reinvested some of the ill-gotten gains by purchasing more of FCC stock in June and October of 2003'. The new capital raised by FCC from the stock sale to PMI was used to expand operations and generate more business for the RICO enterprise.                          -13-

31. PMI Group the parent company of PMI, formed PMI Consulting Company, PMICC. PMI needed to try and camouflaged the association-in-fact racketeering enterprise and in January 2003, announced the formation of PMICC. The FTC and HUD were investigating Fairbanks Capital Corp., and were getting close to PMI. The newly formed entity PMICC was established specifically to manage PMIG's "strategic investments" of the PMI Group, such as FAIRBANKS CAPITAL CORP. FCC was a "strategic investment" that generated business opportunities for PMI to sell insurance products. PMICC was created to give cover to the existing "RICO enterprise."

32. PMICC was setup as a "FRONT-manager of the association-in-fact enterprise," to monitor the racketeering activities and to give cover for the close working relationship between FCC and PMI. PMICC had FCC change its name to Select Portfolio Services-SPS, but, the arrangement later failed and FCC was sold in January 2005 to Credit Suisse, a Swiss owned Bank. Even though, PMI's counsel earlier had denied that PMI & FCC had a close relationship, the PMICC announcement 2003` proved my point, that they in fact had a close working relationship. (Exhibit-15).

33. PMI received payments from FCC as insurance premiums that did not always insure risks. As the example in June 2001 documented and showed that a $1,099.00 amount was deducted for insurance from my June 2001 mortgage payment. Even if PMI tried to say that it was for insurance, it was taken from Plaintiff, after the exposure period of the risk had already passed. Without notification to Plaintiff. PMI would not have paid on any losses to lenders or investors if there were claims made prior to June 21, 2001`.

-13-

34. The KLT reveals, when the "tie-in sale" occurred and how FCC intentionally lapsed, the insurance coverage from TMS and forced placed PMI's coverage on Plaintiff in June 2001 and charged Plaintiff for coverage that was not previously supplied, in violation of anti-trust laws. FCC double-billed Plaintiff on June 21, 2001 for insurance on a force-placed policy or overlapped TMS and charged for insurance that wasn't in effect until July 1, 2001 by charging $1,099.00 in June for a July premium and again charging in July a second time and monthly thereafter. PMI knowingly received the disguised insurance payments from FCC. PMI accepted the payments by FCC that were paid by Plaintiff and were mixed in with and part of the extortion payments. These were not all real insurance premiums and should not be protected by the McCarren Ferguson Act that protects Insurance Companies. The Act does not protect Insurance Companies from acts of fraud.

35. PMI gave authority to FCC to write insurance and to act on their behalf as an agent. PMI collected payments and accepted payments from the racketeering activities and probably deducted some as insurance costs on PMI's corporate books on the business generated from FCC. A portion of the extortion payments and fraudulent $87,567.71 of arrears included the inflated insurance charges for insurance coverage, and was pocketed by PMI through FCC. The insurance payments deducted in June 2001' and thereafter represent some of the extortion payments of ill-gotten gains taken from Plaintiff, that were generated by the RICO enterprise activities and shared by FCC and PMI. (Exhibit-9, FCC Escrow Statement dated October 2003').

-15-

36. The insurance products and underwriting process used were key components to the enterprise for completing the frauds. The shared underwriting of risks as an example, FCC & PMI used FICO scores to rate consumers <u>on individual loans</u> during the underwriting process of various types of insurance. (Exhibit-16, SEC 10k report 2003). Defendants' "phished" to select and assort loans, according to the FICO scores. Loans with low scores were easier to abuse than higher scored loans. Lower scored loans were targeted by the servicer because of a belief in the sub-prime industry that lower FICO scored loans, defaults are expected, as oppose to higher scored loans. That lower FICO scored loans default at a higher rate percentage and <u>were inevitable,</u> because of the low scores of the homeowner's finances. FCC advanced this half-truth theory of sub-prime risks on defaults, which was readily accepted by the lenders as part of the business. Sub-prime loans were more inclined to default compared to "A" credit loans. FCC abused their trust with investors and left out the facts that they were the real cause of the increased defaults and the higher than normal amount of defaults in their portfolios. FCC defaults ran higher than the national average rate did on the defaults. This industry belief on defaults was an opened door Defendants' used to disguise the abuse. Defendants' worked to intentionally lower scores on loans, cultivated & fed them through the now, well known "default manufacturing scheme." Defendants reduced claim losses by cherry picking risks with equity built in to foreclose on such as they did to Plaintiff and collected the higher rates with no losses.

37. PMI's participation as an Insurance Company was critical because the ability to create insurance charges while controlling the accounts provided away for the

-16-

enterprise to apply the overcharges and generate income, with a built-in conduit to make payments through, then wash the money and conceal all of the activities between the entities. It gave license to the "enterprise" to easily create the arrears, collect, than cover up, as well as, baffle and stifle any attempts by anyone to reconcile the loan servicing or insurance coverage. When authorities got close Defendants' transferred the loans to another loan servicer and/or another insurance company, dumping loans and getting off risks with loans bundled together or separately. This process is known in "Predatory Lending Practices" and has been referred to by the U.S. Senate as, "flipping," which is the practice of flipping loans from one loan servicer to another. And is done to cash-in and escape authorities by transferring the loans and changing the trailing business's name and/or business ownership in the wake. Both TMS, FCC with PMI were involved in "flipping." Plaintiff's loan was "flipped" to Wilshire. (Ex-20. Hedge Funds bidding for Ameriquist-article January 11, 2007 New York Post)

PMI was instrumental to the RICO enterprise. A legitimate insurance company would have picked up early on the unusual signs from the racketeering activities that showed up in underwriting, servicing or loss ratio's through normal operations or audit procedures. Normal procedures for insurance companies do not allow double billing. An Insurance Company would never expect a zero % ratio on claims of high risks products either, or even an unusual one, as much as they would like. And would question any loan servicer responsible, as a normal part of standard practices, to what was going on, if they were a legitimate operation. The Company would want to know how they were doing it, to expand or to shut it down. Thieves steal from everyone.

-17-

In violation of section 2 of the Sherman Act, PMI conspired to monopolize the mortgage insurance market by preying on low income borrowers and/or on low FICO scored borrowers, including Plaintiff, by force-placing its insurance on their accounts at artificially high prices based on false arrears.

**38. Credit Rating–How Defendants' used the CRA's to lock-in Plaintiff to the fraud.**

39. Plaintiff's Credit Report dated 12/2/03 documents arrears, delinquencies and foreclosures that were put onto Plaintiff's mortgage credit reports by the fraudulent entries submitted by defendant FCC to the Credit Rating Agencies (CRA) and injured Plaintiff. (Exhibit-17 Plaintiff's credit report dated 12/2/03).

40. Fairbanks Capital Corp., intentionally concealed its name on credit reports. FCC showed up on Plaintiff's credit report as a "Loan Servicer", as an unnamed loan servicer, so FCC could not be easily tracked when investigated. FCC reported negative information to Equifax, Experian and Trans Union the three major Credit Bureaus (CRA's). The foreclosure was put on Plaintiff's reports and left on multiple times to destroy his financials. Plaintiff had low FICO credit scores because of these multiple foreclosure entries and found obtaining refinancing or alternate insurance was impossible. Information is entered by unscrupulous sources such as FCC, and is readily accepted by the CRA's on consumers without verifying the accuracy of the information, to the consumer's detriment. This information is distributed and picked up by smaller Data Broker research firms, creating a maze of "misinformation" on the consumer's reports, affecting their credit scores more and overall finances.

41. The credit card companies apply a "universal default" on current accounts because of the misinformation found on the credit reports regarding the FCC foreclosure, and charged higher interest rates unfairly on current accounts, as was done to Plaintiff. Medical records are kept private so should financial records. Loan Servicers enter information at will and without fear of any recourse from regulators, they unabashedly fly under the radar of the New York State Department of Banking laws pertaining to mortgage loan servicers. FCC escaped the regulation requirements that curtail abuses because the New York State Department of Banking does not regulate mortgage loan servicers.

42. Plaintiff tried to refinance. It was nearly impossible to try and refinance the loan, it would have been very expensive at the very least, if possible, with bottomed out FICO scores. The multiple hits to your credit by the foreclosures on your report flat-lined your rating scores driving up all costs. These low FICO scores dramatically affect all of your finances. This was how Defendants locked you into their fraudulent enterprise schemes. The FICO scores are determined by the rating system from the "Fair Isaac System" owned by Marsh, the insurance conglomerate.

43. In February 2002, I tried to refinance and FCC raised the amount of fraudulent arrears arbitrarily and intentionally on Plaintiff, and killed any chance for a refinance. FCC customer service representatives refused my requests made over the phone of an accounting on the mortgage, and refused to send me the written amounts of what they were claiming I owed. Plaintiff did not agree with FCC, as to the arrears amount.

-19-

44. FCC raised the amount of arrears to stop me from trying to refinance away from them so they could continue to extort payments or would otherwise force me to pay the inflated false arrears before getting out from under them, but, either way FCC would collect on the fraudulent arrears. FCC controlled the process.

45. FCC customer service rep's stated these false arrears amounts and demands, over the phone to me, that were set intentionally high to keep me from refinancing and controlled by their schemes. FCC wanted Plaintiff to keep paying as much money as he had. The damaged credit reports locked-in plaintiff, to the enterprise's schemes. The Plaintiff-Homeowner could not move to other insurance companies because of bad credit scores caused by FCC practices and could not refinance away from FCC without paying these outrageous sums of false arrears that FCC created. No matter how much you gave FCC they would just raise the amount higher so you always owed more and would have to keep paying them. FCC purposefully kept you in their "default manufacturing scheme."

46. The final damage to your credit history and finances by FCC, came after the foreclosure sale and were made by FCC to cover up the racketeering activities. FCC left the foreclosure on Plaintiff's credit history showing as multiple occurrences, intentionally leaving Plaintiff devastated and in financial ruins, in a financial state with no credibility or viable chance of success to seek-out help from authorities. Even when DOLAN's property had retained more than enough equity in it to cover all of the usurious overcharges that FCC unlawfully placed on the mortgage from the sale.

-20-

47. The credit report history was used against you in the frauds, it was as if a threatening weapon was pointed at you, you were held hostage, while the credit reports were manipulated by FCC to take control of your finances, so the Defendants could carry out the frauds to completion. You could not move away without the risk of severe repercussions, such as immediate total financial destruction, that risked scattering your whole family unit apart, left with no where to live for your wife and (4) children. If you didn't pay. FCC's counsel moved to evict Plaintiff twice. As a back-up plan, I searched for rental homes, but was repeatedly turned away because of our credit history. Plaintiff's family would be left in a position with a strong possibility, that we would have been separated without the prospects of ever reuniting again. The threat of foreclosure was intimidating and daunting, eviction was hopeless, and Plaintiff faced total financial ruin.

### 48. "The Smoking Gun"- Was found in 'how' FCC used the "IRS form – 1099A"

(Exhibit-18, IRS form - 1099A Sent out by FCC a year after the foreclosure).

49. The "Smoking Gun," is the IRS form 1099A and how FCC used it to complete the frauds. FCC is required to report the foreclosure to the IRS for the tax year 2003' on the IRS form 1099A. FCC listed our mortgage at $220,852.00 and listed the market value of our home at $304,000.00 in box 4 on the IRS form-1099A. Basically, FCC added the $87,567.71 in false arrears to the mortgage amount, to arrive at this approximate market value of $304,000.00 that was arbitrarily determined by FCC. The true market value of Plaintiff's home in May 2003 was $600,000.00. This was how the enterprise collected the last amount of the fraudulent arrears money and then covered up all of their unlawful tracks.                                              -21-

FCC used the equity in the property to collect the fraudulent arrears. The property sale generated a future imputed income to Plaintiff on the Capital gains from the spent equity in his property. But, would not show up until years later, because of how the tax law cycle works when you sell your primary home. The law allows you two years to find another primary home of equal to or higher value, before you have to pay tax on the equity-gain made on the sale of the property. Because the gain would not be recognized as a gain until later it was a future imputed-income capital gain. The IRS would not want the taxes due on the spent equity until it was determined whether a repurchase of another primary home had occurred. Meanwhile, FCC and PMI were long gone from the transaction.

50. FCC collected the fraudulent arrears from Wilshire by the transfer of the loan after foreclosing on Plaintiff, May 30, 2003. FCC transferred our mortgage to Wilshire on July 1, 2003 and was either paid by Wilshire in cash or bartered value for the arrears amount. Wilshire paid or credited FCC the market value stated in box 4, minus the loan entered on the IRS form 1099A. FCC collected the $87,567.00 from the transfer or from the sale, that was completed in the next week or so between Wilshire and the 3rd party. Wilshire added its own profits of at least, $30,000.00 on top of the market value and was fully reimbursed on the total amount from the new sale of $335,000 made to the 3rd party including the $87,567.71 that Wilshire had paid to FCC.

51. FCC sold my loan to Wilshire. The new loan servicer-Wilshire, sold our property to a 3rd party, in this pre-arranged shady deal that had been made by FCC.

The deal had been setup between "FCC and FCC's counsel, and this 3rd party buyer," to be completed by Wilshire, before Wilshire actually received the loan from FCC. This same FCC counsel represented the new 3rd party buyer in the pre-arranged deal with Wilshire.

52. And at the same time, Defendant FCC was stalling me. FCC was telling me that it was looking into the foreclosure. FCC was not looking into this foreclosure and was instead intentionally delaying me, while they completed the pre-arranged sale. (Ex-19. FCC ltr to plt. dated 6/27/03 confirms the delaying). The Orders from NYS Supreme Court are in the Court's evidence and explain the foreclosure sale(s) in full details.

53. The Foreclosure sale generated proceeds to Defendants FCC & PMI. The transfer and sale paid out a windfall to all parties. Approximately $87,567.71 was paid to FCC, and Wilshire netted a fee of at least, $30,000.00 after paying off FCC and the mortgage loan. The 3rd party buyers got the property for $335,000.00 with a large amount of built-in equity, of nearly $300,000.00 from my property. Plaintiff's property had a true market value of $600,000.00 on May 30, 2003`. The 3rd party (was a Title Insurance Agency Owner), got the FCC-bid on the property with all of the equity, from his friend for free that was arranged by the Defendant's FCC counsel. The shady deal was completed and had no one left behind to follow the trail, except the foreclosed homeowner whom no one would believe.

54. Whether or not FCC treated the $87,657.71 windfall as a return of expenses or not, can not be determined without review of FCC corporate books on the transaction. But what can be determined is, that FCC wanted to be paid and was paid, on the fraudulent arrears.                                    -23-

FCC claimed that Plaintiff owed $87,567.71 of arrears and then sold the property to Wilshire valued at enough to cover the FCC alleged losses. FCC entered the market value, set to cover the arrears in box 4 on the IRS form 1099A. FCC got the money. FCC, without a doubt wanted to recapture the losses from the corporate advances they allegedly made. So there can be no denying by Defendants, that FCC collected the fraudulent arrears. And FCC did. FCC collected the unlawful proceeds from the pre-arranged deal with Wilshire and the 3rd party. FCC either way treated the $87,567.71 windfall, income tax free. As a return of phony expenses or collected the equity laundered through the market valuation, under the table, by having Wilshire pay the full market valuation price to FCC on the transfer.

55. Plaintiff maintains that Defendants did not make the corporate advances that they made false entries on his account, and instead claimed that they made them. FCC demanded and received the extortion payments made by Plaintiff. FCC could collect the equity and still show the arrears as a loss. Losses could be used to offset corporate income taxes, and traded up to parent entities.

56. FCC sold and transferred Plaintiff's property and received the $87,567.71, when Wilshire paid FCC. FCC was paid from the transfer to Wilshire, on these $87,567.71 of fraudulent arrears and PMI received part of this payment in completion of the frauds.

57. The $87,567.71 windfall was disguised by how FCC reported on the foreclosure to the IRS. A future imputed capital gains income was generated on the difference between the loan amount (the basis) and the market value (the sales price).

-24-

58. The loan subtracted from the market value equals the equity. The IRS would automatically assume from the 1099A form that Plaintiff-homeowner, as the owner, would have received the leftover equity-gains generated from the sale or was used to settle debts and in either case would be chargeable to Plaintiff. The equity-gain was the difference in the amount above the basis (loan) and market value (price) shown in box 4 of the IRS form 1099A. The IRS would not look for an unnamed "Loan Servicer," that doesn't exist anymore, 2 years later, for capital gains tax due on the spent equity. DOLAN would have to pay the taxes.

59. FCC reported the market value to cover their false arrears, to the IRS on form 1099A. The taxes will be due as capital gains, charged to Plaintiff, two years after the sale. As noted, you normally have two years to repurchase another home of equal or higher value to avoid incurring any immediate capital gains on the appreciation from a primary home sale. As most people do. Only in this case Plaintiff did not have equity or a home to trade-up anymore, because Defendants' spent his equity on the phony arrears, foreclosed and sold his home, out from under him completing the fraud. Plaintiff is still liable and he would have to pay taxes on the capital gains generated from the phony arrears, without having any assets and left in financial ruins. FCC used these tax laws to disguise their unlawful racketeering activities and concealed the payments they received from the transactions with Wilshire. Defendants' controlled loan servicing to collect ill-gotten gains from Plaintiff-homeowner. Defendants' FCC & PMI concealed the fraud payments from the IRS.

-25-

60. The $304,000.00 market value set by FCC <u>created</u> the tax liability charged to Plaintiff when FCC spent the equity. FCC entered the $304,000.00 in box 4 on the IRS form 1099A. This market value entry hid the windfall payment from Wilshire to FCC. This market value was set artificially to cover the arrears and to <u>leave enough incentives</u> in the transaction for Wilshire and the local parties, to complete the transaction for the RICO enterprise. This transaction process hid how the loan servicer-FCC, was paid on some of the fraudulent arrears it overcharged Plaintiff. FCC transferred the Plaintiff's mortgage servicing rights to Wilshire Credit Corp., orchestrated the sale and was able to cover up the entire scheme.

61. Defendants committed frauds on Plaintiff and got away scot-free. FCC had in their loan portfolio at the time of DOLAN's sale, approximately 45,000 family homes in foreclosure, with another 100,000 families somewhere in the FCC foreclosure process according to the United States Attorney Generals' investigation. FCC serviced a loan portfolio that was worth over $50 billion, with more than half from the GSE's FANNIE MAE and FREDDIE MAC. These mortgage loans primarily consisted of the volatile "adjustable rate mortgages (ARM's)" used as the sub-prime loan of choice, and the ones targeted by the "Predatory Loan Servicers" of non-traditional mortgages. As a loan servicer, FCC collected billions of dollars per month from homeowners, for lenders and investors, and did not always pay them on time or at all and always had someone else to blame.

62. It's been reported by the American Banking Association that a single foreclosure has been estimated to cost the Community it occurs in, at least $50,000.00 for each one.

-26-

From the lost taxes due the municipalities, to costs of services from the various governments to reconcile the aftermath, let alone the destruction caused to the family units and impact this has exponentially on everyone involved. The long-term effects a foreclosure has on people and their Communities are immeasurable.

## CONCLUSION

63. Plaintiff demonstrates how Defendant's not only abused Plaintiff's family but also abused tens of thousands of Americans families every year, as well as their Communities through patterns of racketeering. Today, mortgage frauds have reached epidemic proportions and threatens our economy creating an environment that could lead to instability in the underlying investments of mortgage backed securities. The mortgage-backed securities make up a sizable $8 trillion amount of our economy. The proper servicing on these mortgage loans is paramount to maintaining the structure and stability of bonds that are relied on for their income payments to investors, retirement funds and municipalities, etc., which are paid out each month.

64. Defendants' are key contributors to the widespread fraud epidemic. PMI tentacles are entrenched in the marketplace as the largest provider of default and pmi insurance products in the home insurance market, coupled with FCC the largest sub-prime loan servicer, and were poised to seize upon the fastest growing loan segment of the American non-traditional mortgage market.

65. In mortgage fraud the automation used to determine appraisal value of property partly caused the overheated growth in home prices. The same type of reliance on

-27-

automation is used to establish FICO scores, without regards to the homeowner and was abused by PMI & FCC. The complete reliance on auto-systems leaves the public vulnerable to abuse by these kinds of "predatory contributors" in mortgage frauds. (Exhibit-21, Business Week, article dated December 25, 2006).

66. Defendants' willfully defrauded homeowner(s) in an attempt to monopolize the market and Plaintiff is one homeowner, who has been injured by their efforts.

67. Plaintiff is thankful to the Court for its graciousness in allowing the opportunity to plainly restate the facts, in compliance with Rule 9(b), and respectfully asks the Court to deny Defendants' motion(s) to dismiss.

Dated: January 15, 2007

Signed: Suffolk County, NY

X _____
Michael T. Dolan
Plaintiff – Pro Se, non-attorney
21 Kent Place
Smithtown NY 11787

-28-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

MICHAEL T. DOLAN
Plaintiff,

                                        **NOTICE OF MOTION for**
                                        **AMENDED COMPLAINT**
                                      **03-CV-3285 (DRH) (MLO)**
                            **Dolan –v- Fairbanks Capital Corp.;**
                                **PMI Mortgage Insurance Company**

v.


FAIRBANKS CAPITAL CORP., a Utah corporation,
And;
PMI Mortgage Insurance Company, Walnut Creek, CA.,
Defendants.

-----------------------------------------------------------------------X
State of New York) ss.
County of Suffolk)

## NOTICE OF MOTION

Please take notice that upon the affidavit and affirmation Michael T. Dolan sworn to or affirmed on January 15, 2007 submit to the USDC Eastern District NY Plaintiff has served by way of regular US Mail the notice of motion, for amended complaint to all of the defendants in above caption and attached addresses.


Dated: January 15, 2007

Signed: Suffolk County, NY


X _____
Michael T. Dolan
Plaintiff - PRO SE
21 Kent Place
Smithtown NY 11787

# ADDRESSES: for USDC NY

**United States District Court**
**Eastern District of New York**
Alfonse M. D'Amato United States Courthouse
100 Federal Plaza
Central Islip, New York 11722-4438

**Plaintiff:**
**Michael T. Dolan – Pro Se**
21 Kent Place
Smithtown, New York 11787

**Defendants & Attorneys' for defense:**

**C/O – PMI Mortgage Insurance Company**
Joshua Schwartz,esq
O'Melveny & Meyers LLP
Times Square Tower
7 Times Square
New York, NY 10036

**C/O - defendants**
**Fairbanks Capital Corp**
**Fairbanks Capital Holding Corp**
**Thomas D. Basmajian**

Sheldon May & Associates
Ted Eric May, esq.
255 Merrick Road
Rockville Centre, New York 11570

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

MICHAEL T. DOLAN

Plaintiff,

                                                   PROOF OF SERVICE for
                                              AMENDED COMPLAINT
                                     03-CV-3285 (DRH) (MLO)
                                Dolan –v- Fairbanks Capital Corp.

v.

FAIRBANKS CAPITAL CORP., a Utah corporation,
and
PMI Mortgage Insurance Company, Walnut Creek, CA.,

Defendants.

-------------------------------------------------------------------X

State of New York) ss.
County of Suffolk)

## PROOF OF SERVICE

Please take notice that upon the affidavit and affirmation Michael T. Dolan sworn to or
affirmed on June 21, 2006 submit to the USDC Eastern District NY that Plaintiff has
**served** by way of regular US Mail the Amended Complaint to Defendants' Fairbanks
Capital Corp et al., and all of the defendants in above caption and attached addresses.

Dated: January 15. 2007

Signed: Suffolk County, NY

X_____
Michael T. Dolan
Plaintiff - PRO SE
21 Kent Place
Smithtown NY 11787

## ADDRESSES: for USDC NY

**United States District Court**
**Eastern District of New York**
Alfonse M. D'Amato United States Courthouse
100 Federal Plaza
Central Islip, New York 11722-4438


**Plaintiff:**
**Michael T. Dolan – Pro Se**
21 Kent Place
Smithtown, New York 11787


**Defendants & Attorneys' for defense:**

**C/O – PMI Mortgage Insurance Company**
Joshua Schwartz,esq
O'Melveny & Meyers LLP
Times Square Tower
7 Times Square
New York, NY 10036

**C/O - defendants**
**Fairbanks Capital Corp**
**Fairbanks Capital Holding Corp**
**Thomas D. Basmajian**

Sheldon May & Associates
Ted Eric May, esq.
255 Merrick Road
Rockville Centre, New York 11570

See Court
File for
Exhibits