UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MICHAEL T. DOLAN,

                    Plaintiff,                                    **MEMORANDUM AND ORDER**
                                                                 03 CV 3285 (DRH) (AKT)
          - against -


FAIRBANKS CAPITAL CORPORATION, a
Utah corporation, and PMI MORTGAGE
INSURANCE COMPANY, Walnut Creek, CA,


                    Defendants.
----------------------------------------------------------X
**APPEARANCES:**

**For the Plaintiff:**
**MICHAEL T. DOLAN, PRO SE**
21 Kent Place
Smithtown, New York 11787


**For Defendant Fairbanks Capital Corporation:**
**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
10 Bank Street, Suite 1061
White Plains, New York 10606
By:     Riyaz Gulam Bhimani, Esq.


**For Defendant PMI Mortgage Insurance Company:**
**BOUTIN & ALTIERI, PLLC**
1261 Post Road
Fairfield, Connecticut 06824
By:     John L. Altieri, Jr., Esq.


**HURLEY, Senior District Judge:**

          Pro se plaintiff Michael T. Dolan ("plaintiff" or "Dolan") commenced this action alleging

that defendants Fairbanks Capital Corp. ("FCC")[1] and PMI Mortgage Insurance Company

---

          [1]     FCC's counsel refers to defendant as "Select Portfolio Servicing, Inc. ('SPS')
formerly known as Fairbanks Capital Corporation."  (FCC's Mem. at 1.)  Because the docket
continues to reflect defendant as Fairbanks Capital Corporation, however, the Court will refer to
defendant as FCC in this Memorandum & Order.

("PMI") violated various federal and state laws in connection with the servicing of his mortgage and related foreclosure proceedings. Presently before the Court are separate motions made by FCC and PMI pursuant to Federal Rule of Civil Procedure ("Rule") 56 seeking dismissal of the Second and Third Amended Complaints. For the reasons set forth below, FCC's motion is granted in part and denied in part and PMI's motion is granted in its entirety.

### BACKGROUND

The following facts, which are drawn from the parties' Local Civil Rule 56.1 Statements, the pleadings and the voluminous exhibits attached thereto, and the parties' submissions, are undisputed unless otherwise noted.

### Relevant Facts

On February 11, 1998, plaintiff executed, acknowledged and delivered to non-party Premier Mortgage Corp. (d/b/a PMC Mortgage Co.) ("Premier") a note in the principal amount of $224,000 (the "Note"), which was secured by a mortgage (the "Mortgage") encumbering the property located at 21 Kent Place, Smithtown, New York (the "Property"). (Decl. of Riyaz G. Bhimani, dated May 20, 2011 ("Bhimani Decl."), Exs. A & B.) In June 1998, the Note and Mortgage were assigned from Premier to TMS Mortgage Inc. (d/b/a The Money Store) ("TMS"), and this assignment was recorded in the Office of the Clerk of Suffolk County on August 2, 1999.

On August 11, 2000, plaintiff and his wife, Donna Dolan, entered into a forbearance agreement with TMS (the "August 2000 Forbearance Agreement"). According to that agreement, plaintiff had "failed to make regular monthly payments" as required by the Note and

Mortgage, the loan was in default, and TMS had "instituted foreclosure."[2] (Bhimani Decl., Ex. D at unnumbered page 3.) At plaintiff's request, TMS had agreed to enter into the August 2000 Forbearance Agreement and hold foreclosure proceedings in abeyance. Pursuant to the August 2000 Forbearance Agreement, plaintiff was required to pay a total of $51,136.10 "to bring the loan current through and including the 08/17/00 payment." (*Id.*) The agreement set forth a payment schedule that required plaintiff to make monthly forbearance payments in addition to his regularly scheduled monthly mortgage payments. (*Id.*)

On November 7, 2000, TMS notified plaintiff that FCC would begin servicing plaintiff's mortgage as of November 22, 2000.[3] (Bhimani Decl., Ex. E.) Plaintiff asserts that the August 2000 Forbearance Agreement, which had been executed several months prior to FCC's involvement with his loan, "was in-force at the time of the transfer to FCC" and that plaintiff made monthly payments to FCC pursuant to the August 2000 Forbearance Agreement beginning in November 2000. (3d Am. Compl. ¶ 7.)

On October 22, 2001, TMS commenced foreclosure proceedings against plaintiff in New York State Supreme Court, Suffolk County. (Bhimani Decl., Ex. F.) In the complaint filed in those proceedings, TMS alleged that plaintiff had "failed to make and pay the installment of principal and interest due and owing on October 17, 2000 and thereafter, despite due demand

---

[2]        It does not appear that, as of that date, TMS had commenced a foreclosure action in any court of law.

[3]        TMS defined "the servicing" of plaintiff's mortgage as "the right to collect payments from you." (Bhimani Decl., Ex. E.)

therefor."[4]  (*Id.* at ¶ 7.)  Thus, TMS sought "the unpaid principal sum of the NOTE and

MORTGAGE in the amount of $220,852.53 with accrued interest at 14.125% per annum, from

September 17, 2000."  (*Id.* ¶ 8.)

On September 23, 2002, FCC (as the servicing agent for TMS) and Dolan entered into a

second forbearance agreement (the "September 2002 Forbearance Agreement"), which was filed

in the foreclosure action.[5]  (Bhimani Decl., Ex. G.)  That agreement provided that plaintiff had

failed to make monthly payments as of October 17, 2000 and, as such, TMS had "elected to

declare the unpaid principal sum of the NOTE and MORTGAGE in the amount of $220,852.53

with accrued interest at 14.125% per annum, from September 17, 2000, to be immediately due

and payable."  (*Id.* ¶ 7.)  In the agreement, Dolan "acknowledged that [he] is indebted to [TMS]

in . . . the sum of $87,567.71," and agreed to the payment plan set forth in the September 2002

Forbearance Agreement.  (*Id.* ¶ 8.)  In exchange, TMS agreed "to take no further action to

foreclose the Mortgage."  (*Id.*)

The September 2002 Forbearance Agreement required plaintiff to "make a down payment

of $15,000 on or before September 16, 2002," and then make five monthly payments of $4,000

between October 2002 and February 2003.[6]  (*Id.* ¶ 9a.)  On or about September 30, 2002, Dolan

---

[4]        Although the original loan amount was for the amount of $224,000, as evidenced
by the Note (*see* Bhimani Decl., Ex. A), the Verified Complaint filed in the foreclosure action
stated that the original loan amount was $214,000 (*see id.*, Ex. F at ¶¶ 3 & 4.)

[5]        The September 2002 Forbearance Agreement also erroneously stated that the
original loan amount was $214,000, even though the Note reflects that the original amount of the
loan was $224,000.  (*Compare* Bhimani Decl., Ex. A *with* Ex. G at ¶ 2.)

[6]        Once these payments were made, plaintiff was to "make regular monthly
payments at the regular mortgage amount according to the . . . Note and Mortgage" as of March
2003.  (Bhimani Decl., Ex. G ¶ 96.)

made the required $15,000 down payment.  (Bhimani Decl., Ex. K at ¶ 9 and Ex. M at 1; 3d Am.

Compl. ¶ 10 & Ex. 6.)  Plaintiff asserts that he "was forced to pay [this amount] or FCC would

foreclose."  (3d Am. Compl. ¶ 10.)

In November 2002, FCC determined that plaintiff was in default of the September 2002

Forbearance Agreement and the foreclosure proceedings brought by TMS against Dolan were

reinstated.  (*See* Bhimani Decl., Ex. C at ¶ 11.)  On May 30, 2003, the Property was sold

pursuant to a Judgement of Foreclosure and Sale to non-party Michael Haley, who then assigned

his rights in the Property to non-party Anthony Rigole.[7]  (*See* Bhimani Decl., Ex. I at 1; Pl.'s

Opp'n, Ex. A at unnumbered page 7-8.)  Subsequently, Dolan – who had not, up to that point,

entered any appearance in the foreclosure action – moved to vacate the Judgement of Foreclosure

and Sale as well as the subsequent sale of the Property.  (Bhimani Decl., Ex. I at 1.)  Rigole

brought separate eviction proceedings against Dolan, and those proceedings were joined with the

foreclosure action.  (*Id.*)  Dolan was granted temporary injunctive relief and awarded possession

of the Property pending the outcome of the foreclosure proceedings.  (*Id.*)  Neither FCC nor PMI

were named as parties in the foreclosure proceeding.

On July 1, 2003, while the foreclosure action remained pending, FCC transferred to

Wilshire Credit Corporation ("Wilshire") all of its servicing rights to plaintiff's loan.  (Bhimani

Decl., Ex. J.)

### Subsequent State Court Proceedings

On March 22, 2004, New York State Supreme Court Justice Patrick Henry issued an

---

[7]     Michael Haley purchased the Property pursuant to the foreclosure sale and, by
agreement dated July 2, 2003, assigned all of his rights to the Property to Rigole for the sum of
$10.

5

interim order that, *inter alia*, denied without prejudice Dolan's motion to vacate the Judgement

of Foreclosure and Sale. (2d Am. Compl. (Second document attached to the pleading).) Justice

Henry reasoned that pending settlement negotiations between Dolan and Rigole, which could

allow Dolan to repurchase the Property from Rigole, might resolve the entire matter and obviate

the need to decide the pending motion. (*Id.* at 3.) Justice Henry continued:

> In the event that negotiations do not resolve the dispute, the record
> reflects that numerous issues of fact are raised with regard to the
> method, manner and the veracity of the lenders' representations to the
> [Dolans] which require further examination and disclosure. The
> proceeding appears procedurally in compliance with the foreclosure
> statute. However the propriety of the two forbearance agreements
> signed on or about September 24, 2002 and August 11, 2000, the
> lenders' operating procedures, the acceptance and appropriation of
> [the Dolans'] substantial payments pending foreclosure and judgment
> on default between 2001 and 2002, and the similarity of the abuse
> claimed by the Dolans and those publicized in federal investigation
> and recently settled between the lender, FTC and HUD in late 2003,
> raise a basis for inference and issues concerning intent, and the need
> for scrutiny.

(*Id.*) In a subsequent Order dated December 6, 2004, Justice Henry noted that the negotiations

between Dolan and Rigole "never got off the ground," and referred the matter to an appointed

Judicial Hearing Officer for a hearing and determination on "all outstanding issues." (2d Am.

Compl., Ex. IV, Doc. 15.)

The foreclosure proceeding was thereafter referred to Judicial Hearing Officer ("JHO")

Morton I. Willen, who held an evidentiary hearing on February 1 and 14, 2005. (Bhimani Decl.,

Ex. I at 1.) In a written decision dated April 18, 2005, JHO Willen granted Dolan's motion to set

aside the judgment of foreclosure and sale, set aside the sale of the Property to Rigole, excused

Dolan's default in the foreclosure action, and permitted him to "interpose an answer and assert

whatever defenses [he] deem[ed] appropriate."[8]  (*Id.* at 5.)  JHO Willen determined that TMS

and its servicing agents had "failed to properly credit Dolan in excess of $10,000" in 2001 and

2002 and that "Dolan was injured because of [the] failure to timely apply these payments to

principal and interest."  (*Id.* at 3.)  JHO Willen further concluded that "[t]he interest rate of

14.125% was [improperly] frozen [even though] the lending documents require adjustment every

six months," and that "[t]his inconsistency in assessing interest rates resulted in inaccurate

crediting to the detriment of the borrower."  (*Id.*)

JHO Willen further concluded that "[e]ach of the [forbearance] agreements contain either

egregious mistakes and/or overreaching and unconscionable clauses."  (*Id.*)  JHO Willen found

that the September 2002 Forbearance Agreement entered into by FCC and Dolan was "[t]he

singular most flagrant of the forbearance agreements" in that it claimed that plaintiff owed

$87,567.71 in arrears despite the fact that "there is nothing in the record to support this."[9]  (*Id.* at

4.)  Moreover, the agreement listed the unpaid principal on the mortgage as $220,853, but JHO

Willen found that "[t]he mortgage balance is obviously and substantially incorrect when taking

into account the aforementioned failures to credit or timely credit payments which ought to have

reduced both principal and interest."  (*Id.*)  Overall, JHO Willen determined that the September

2002 Forbearance Agreement's provisions were "oppressive, overreaching and shock the

conscience of the court."  (*Id.*)  He continued:

---

[8]     JHO Willen's written decision is in the form of an order, rather than a
recommendation, because he was appointed pursuant to Justice Henry's December 6, 2004 Order
"to hear and determine all outstanding issues in this action . . . ."  (Bhimani Decl., Ex. I at 1.)

[9]     JHO Willen noted that between August 20, 1999 and September 24, 2002, Dolan
had paid "the servicing corporation approximately $70,000."  (Bhimani Decl., Ex. I at 1.)

> They present the same and similar predatory lending practices which induced this very same servicing corporation (Fairbanks) to settle a claim brought against it by the United States Government and agree to pay a fine of forty million dollars ($40,000,000) in 2003. It is apparent . . . that these [forbearance] agreements represent a source of substantial, increased profits over and above the underlying note and mortgage. It is the evils exemplified in this action, which led the FTC and HUD to proceed against [FCC] in the federal action. The huge profits available under the circumstance of borrower default followed by forbearance agreements[ ] suggest a fertile source of revenue, a windfall indeed.

(*Id.* at 4-5.)

In response to JHO Willen's April 18, 2005 decision, TMS and its then-servicing agent Wilshire "applied the $15,000.00 [down] payment made by DOLAN on or about September 30, 2002 [pursuant to the September 2002 Forbearance Agreement] directly to [the] unpaid principal balance," and took other steps to reduce the outstanding principal balance from $220,852.53 to $206.603.38. (*See* Bhimani Decl., Ex. K ¶¶ 8 & 9.)

After JHO Willen's decision was issued, Dolan filed a verified answer in the foreclosure action. (*See* Pl.'s Sur-Reply (Docket No. 352), Ex. at 1.) In addition to denying the allegations in the complaint, Dolan interposed three counterclaims alleging violations of New York General Business Law § 349, breach of the duty of good faith and fair dealing, and misrepresentation. (*Id.*)

The foreclosure action went to trial before New York State Supreme Court Justice Paul J. Baisley, Jr. on April 30, 2010. (*See* Pl.'s Sur-Reply, Ex. at 1.) After hearing testimony from Dolan and a representative of TMS's latest servicing agent, GMAC Mortgage, LLC ("GMAC"), Justice Baisley concluded, in a written order dated July 6, 2012, that TMS's evidence "failed to establish that [Dolan was] in fact in default at the time of the commencement of the instant

foreclosure action." (*Id.* at 2.)  In particular, GMAC's representative testified that "he has no knowledge or information regarding the payment history on the loan, and does not know whether or not the approximately $70,000.00 of payments the Dolans made pursuant to the various forbearance agreements was credited to their account." (*Id.*)  Thus, Justice Baisley dismissed the foreclosure action with prejudice.  (*Id.* at 3.)

With respect to Dolan's counterclaims, Justice Baisley concluded that although "it [was] the law of the case that the actions of [TMS] and/or its agents . . . constituted predatory lending practices," Dolan had failed to proffer any admissible evidence that TMS "has engaged in such practices on a widespread basis which affects consumers generally so as to support [Dolan's] claim for violation of General Obligation Law § 349." (*Id.* at 3-4.)  Justice Baisley also found, however, that Dolan had proffered sufficient evidence to establish his counterclaims for misrepresentation and breach of the duty of good faith and fair dealing.  (*Id.* at 3.)  Overall, the evidence had established to Justice Baisley's satisfaction "that [the Dolans] were thwarted in their efforts to remedy their default and reinstate the mortgage by the predatory lending practices of [TMS] and its servicers." (*Id.* at 4.)  Invoking its equitable powers, Justice Baisley directed TMS to reinstate the mortgage, "the principal amount of which is determined to be $220,000.00, at the current rate of interest as determined in accordance with the provisions of the note and mortgage." (*Id.*)  Other than outstanding real estate taxes, "[a]ll other claimed arrears and accrued interest and penalties [were] deemed cancelled." (*Id.*)

***Procedural History***

<u>The First Complaint</u>

On July 7, 2003, plaintiff (and former plaintiff Donna M. Dolan) commenced this action

pursuant to the "USA Patriot Act of 2001." By Memorandum and Order dated April 23, 2004, the Court dismissed the Complaint without prejudice and gave Dolan permission to file an Amended Complaint that addressed "the pleading concerns enunciated in this order." (Apr. 23, 2004 Mem. & Order at 2.)

<u>The Amended Complaint</u>

On May 24, 2004, Dolan filed an Amended Complaint that asserted eleven causes of action under the Patriot Act, the Clayton and Sherman Acts, the Fair Credit Reporting Act ("FCRA"), the Federal Trade Commission Act (the "FTCA"), the Fair Debt Collection Practices Act (the "FDCPA"), the Real Estate Settlement and Procedures Act (the "RESPA"), the RICO statutes, and civil rights laws against FCC and PMI as well as FCC's parent company, FCHC, and Thomas D. Basmajian ("Basmajian"), an officer of FCC.

The thrust of the Amended Complaint was the FCC committed various acts of fraud on "consumers" generally by, *inter alia*, deliberately failing to post customers' timely mortgage payments to their accounts in order to collect late fees, charging consumers for homeowners' insurance even though the borrowers already had insurance in place, "force placing" insurance coverage on consumers by intentionally lapsing old coverage so that PMI could issue new policies, engaging in dishonest and abusive tactics to collect debts, and deliberately reporting inaccurate information to credit bureaus.

In January 2005, all four defendants moved to dismiss the Amended Complaint. By Memorandum and Order dated August 16, 2005, the Court: (1) granted the motions by FCHC and Basmajian to dismiss the claims against them in their entirety, (2) granted the motion by PMI to dismiss each of the claims against it except for plaintiff's antitrust claims, (3) granted FCC's

10

motion with respect to each of plaintiff's claims except his RESPA and antitrust claims. Thus, only plaintiff's RESPA claims against FCC and antitrust claims against both FCC and PMI remained. Plaintiff was granted leave to amend his FDCPA claim against FCC and to amend his fraud and RICO claims against FCC and PMI.

The Second Amended Complaint

On March 2, 2006, plaintiff timely filed his Second Amended Complaint ("2d Am. Compl."), in which he raised many of the same allegations asserted in his prior pleading. In sum, plaintiff alleged that FCC and PMI "conspired to extract mortgage payments from [him] through abusive, unlawful and deceptive loan servicing practices." (2d Am. Compl. ¶ 10.) Plaintiff asserted RICO claims, antitrust claims, and violations of the FDCPA, RESPA, and the Truth in Lending Act ("TILA"), as well as various state law claims. In support thereof, plaintiff relied, *inter alia*, on the above-cited portions of JHO Willen's April 18, 2005 decision, which described the forbearance agreements as containing either "egregious mistakes and/or overreaching and unconscionable clauses." (*See id.* ¶¶ 126-34.)

In June 2006, FCC and PMI moved to dismiss the Second Amended Complaint. By Memorandum & Order dated December 15, 2006, the Court denied the motions to the extent that the following claims remained viable: (1) plaintiff's claims against both FCC and PMI under RICO (both substantive claims based on extortion and loan sharking as well as conspiracy claims) and antitrust laws, and (2) plaintiff's claims against FCC for violations of RESPA, TILA, and various state laws. The Court dismissed plaintiff's fraud-based RICO claims against PMI and FCC based on plaintiff's failure to plead the alleged fraud with the particularity required by Rule 9(b), and dismissed plaintiff's FDCPA claim against FCC based upon plaintiff's failure to

allege that FCC was a debt collector within the meaning of that statute. The Court granted plaintiff further leave to amend solely for the purpose of attempting to cure these two defects.

The Third Amended Complaint

On January 12, 2007, plaintiff timely filed the Third Amended Complaint ("3d Am. Compl.") against FCC and PMI. FCC filed a motion to dismiss, and that motion was referred to Magistrate Judge A. Kathleen Tomlinson for a Report and Recommendation. On September 8, 2008, Judge Tomlinson issued a Report and Recommendation denying FCC's motion, which this Court adopted in its entirety on September 30, 2008. As a result, the following claims – drawn from the Second and Third Amended Complaints, collectively – are presently pending against both FCC and PMI: (1) substantive RICO claims (based upon extortion, loan sharking, and mail and wire fraud); (2) RICO conspiracy claims; and (3) antitrust claims. The following claims are also presently pending against FCC only: (1) RESPA claims; (2) FDCPA claims; (3) TILA claims; and (4) various state law claims based upon FCC's alleged deceptive and fraudulent conduct.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. The court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). A district court considering a summary judgment motion must also be "mindful [ ] of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *See id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.     *Plaintiff's Substantive RICO Claims Against FCC and PMI are Dismissed*

"RICO is a broadly worded statute that has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir. 2001) (internal quotation marks omitted). "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001) (internal citations and quotation marks omitted). FCC attacks the first and third elements, while PMI attacks the third element only.

### A.     *As to FCC*

Because plaintiff's failure to establish the first element, to wit, a violation of the RICO statute, is fatal to his RICO claim against FCC, the Court's discussion is limited to that element.

"To establish a substantive RICO violation, a plaintiff must show a 'pattern of racketeering activity.'" *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (quoting 18 U.S.C. § 1962(a)-(c)). Under the RICO statute, a "pattern of racketeering activity" is comprised of at least two predicate acts of racketeering activity, as defined in 18 U.S.C. § 1961(1), that occurred within ten years of each other. *See* 18 U.S.C. § 1961(5). The two predicate acts "must be related and either amount to or pose a threat of continuing criminal activity." *Spool*, 520 F.3d at 183 (internal quotation marks and alteration omitted).

The "continuity requirement," which FCC focuses on in its motion papers, can be met either by "demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of

continuing criminal conduct beyond the period during which the predicate acts were performed," or by "showing a 'closed-ended' pattern – a series of related predicate acts extending over a substantial period of time." *Id.* (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989)). FCC argues that because "this case involves a single mortgage loan that [FCC] serviced for a limited time, and which it no longer services, Plaintiff has failed to establish a pattern of either open-ended or close-ended racketeering activity."[10] (FCC's Mem. at 6.)

### 1.    Open-Ended Continuity

"To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999). "This threat is generally presumed when the enterprise's business is primarily or inherently unlawful." *Spool*, 520 F.3d at 185; *see also United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995) ("[W]here the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, the courts generally have concluded that the requisite threat of continuity was adequately established . . . ."). Here, FCC's underlying business activities – servicing residential mortgages – are not inherently illegal.

Where "the enterprise primarily conducts a legitimate business, [ ] no presumption of a

---

[10]    FCC assumes *arguendo* for purposes of this motion that plaintiff can "present evidence of the predicate acts required to establish a RICO violation." (FCC's Mem. at 5.) The FCC does not, however, concede that plaintiff has done so and, in fact, "maintains that Plaintiff will not be able to present evidence that it committed any of the predicate acts" alleged in the Second or Third Amended Complaint. (*Id.* at 5 n.3.)

continued threat arises." *Spool*, 520 F.3d at 185 (internal quotation marks omitted). Instead,

"there must be some evidence from which it may be inferred that the predicate acts were the

regular way of operating that business, or that the nature of the predicate acts themselves implies

a threat of continued criminal activity." *Cofacredit*, 187 F.3d at 243. Here, plaintiff has not

proffered evidence that "the nature of the [alleged] predicate acts themselves implies a threat of

continued criminal activity." *See id.* Plaintiff asserts that FCC "operated a RICO enterprise to

extract money and property" from him. (Pl.'s Opp'n at ¶ 5.) FCC stopped servicing the Loan as

of July 1, 2003, and there is no record evidence suggesting that FCC intended to continue its

alleged conduct after that date. The Second Circuit has made clear that a scheme that is

"inherently terminable [ ] does not imply a threat of continued racketeering activity." *Cofacredit*,

187 F.3d at 244; *see also Spool*, 520 F.3d at 186 ("A scheme of this sort is 'inherently

terminable' because once the defendants conclude the fraudulent 'processing,' they have no more

CFA-related files with which to work.").

Even assuming *arguendo* that FCC operated a scheme to deprive plaintiff of his money

and property, such a scheme is inherently terminable – at some point, plaintiff's funds would

have been exhausted and his home lost.[11] *See GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67

F.3d 463, 466 (2d Cir. 1995) ("It defies logic to suggest that a threat of continued looting activity

exists when, as plaintiff admits, there is nothing left to loot. For example, the predicate acts

alleged . . . – that is, mail and wire fraud – *could not* have continued once the pool of investor

---

[11] Plaintiff's own allegations make clear that he is alleging a scheme that is terminable in nature. (*See* 2d Am. Compl. ¶ 79 ("After extracting as much money from plaintiff-homeowner which included using extortion, defendants[] foreclosed. Defendants in effect, were moving homeowners such as Dolan along a pipeline into their own 'loan-default manufacturing scheme,' that led to the eventual taking of family residence, property and equity by foreclosure.")

16

interests available for repurchase was exhausted.") (emphasis in the original); *FD Prop. Holding, Inc. v. US Traffic Corp.*, 206 F. Supp. 2d 362, 371 (E.D.N.Y. 2002) ("Allegations of conduct that by its nature or design has an intended and foreseeable endpoint will not constitute open-ended continuity.")

Plaintiff has also failed to proffer evidence "from which it may be inferred that the predicate acts were the regular way of operating [FCC's] business . . . ." *See Cofacredit*, 187 F.3d at 243. Plaintiff asserts that FCC applied the same alleged "predatory lending practices" to other "homeowners and investors." (Pl.'s Opp'n at ¶¶ 5, 6.) As support for this assertion, plaintiff relies upon: (1) an undated Newsday article reporting that FCC "had reached a preliminary agreement with the Federal Trade Commission and the U.S. Department of Housing and Urban Development to settle allegations of predatory servicing practices against some of its nearly 600,000 loan clients nationwide," (2d Am. Compl., Ex. IV at unnumbered page 2), and (2) Justice Henry's March 22, 2004 "interim order," in which he noted "the similarity of the abuse claimed by the Dolans and those publicized in federal investigation and recently settled between the lender, [the] FTC and HUD in late 2003" (2d Am. Compl. (Second document attached to the pleading at 3)). Such materials are not, however, sufficient to demonstrate a threat that FCC will engage in continued criminal activity. As enumerated above, the only materials plaintiff can point to in the record to support its position are second-hand reports that FCC entered into a settlement in a separate and unrelated litigation regarding predatory servicing claims that involved an unknown percentage of its business. This is insufficient to raise a question of fact for a jury as to whether FCC actually engaged in predatory servicing practices as a regular way of conducting its business. Thus, plaintiff has failed to show open-ended continuity.

## 2. <u>Closed-Ended Continuity</u>

"A closed-ended pattern of racketeering activity involves predicate acts 'extending over a substantial period of time.'" *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004) (quoting *GICC Capital Corp.*, 67 F.3d at 466). "[T]o measure whether closed-ended continuity exists," the Court must also "weigh[ ] a variety of non-dispositive factors," including "the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes." *GICC Capital Corp.*, 67 F.3d at 467. FCC serviced the Loan for approximately two years and seven months. "However, duration alone is not dispositive, especially in a case where the alleged illegal plan was directed at a single goal and the plan has terminated." *FD Property Holding, Inc.*, 206 F. Supp. 2d at 372; *see also Pier Connection, Inc. v. Lakhani*, 907 F. Supp. 72, 78 (S.D.N.Y. 1995) (noting that "a scheme's duration alone is not dispositive," and "the court must examine the 'overall context in which the acts took place'") (quoting *United States v. Kaplan*, 886 F.2d 536, 542 (2d Cir. 1989)).

FCC cites an unpublished decision issued by the Second Circuit in 2000, in which the Circuit found that an alleged scheme "to deprive plaintiffs of their mortgaged property," which involved "predicate acts of extortion, bank fraud, mail fraud, and wire fraud, taking place over a period of seven years," did not constitute a "pattern of racketeering activity under the RICO statute" because the scheme "involve[d] a single mortgage loan which was paid in full on January 1998." *Ciuffetelli v. Apple Bank for Sav.*, 208 F.3d 202, at *3 (2d Cir. Mar. 30, 2000) (unpublished) (citing *Mead v. Schaub*, 757 F. Supp. 319, 323 (S.D.N.Y. 1991) ("To the extent that the goal of the alleged scheme in this case was to deprive Mead of his client bases, each alleged act constitutes nothing more than a step towards its accomplishment. Although the

alleged scheme to defraud Mead may have required a number of steps over a determinate period of time, nevertheless because of its terminable nature and single goal it does not meet the requirement of continuity.")). "Courts in the Second Circuit have generally held that where the conduct at issue involves a limited number of perpetrators and victims and a limited goal, the conduct is lacking in closed-ended continuity." *FD Property Holding*, 206 F. Supp. 2d at 372 (finding no continuity when alleged criminal conduct involved "a limited number of perpetrators and an alleged non-complex scheme to obtain monies under a sales' contract") (collecting cases); *see also Shamis v. Ambassador Factors Corp.*, 1997 WL 473577, at *17 (S.D.N.Y. Aug. 18, 1997) (no closed-ended continuity when "the scheme . . . had a three-year duration and a discreet, limited goal" that "involves only one group of perpetrators, the defendants, who directed their acts toward one victim with the singular goal of defrauding plaintiff under a single contract") (internal alterations and quotation marks omitted); *Pier Connection*, 907 F. Supp. at 78 (no closed-ended continuity when plaintiffs were the "sole victim" and "Defendants engaged in one scheme whose single goal was to seize control of Pier Connection's business"); *Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 998 (E.D.N.Y. 1995) (finding the "threat of continuity is not present" when "this case involves a single transaction involving one alleged victim, albeit two persons, one real estate transaction, a limited goal, no threatened future action, and no allegation of long-term criminal conduct").

Here, plaintiff has alleged that FCC engineered a scheme to defraud him by using overreaching forbearance agreements, collecting "false arrears" from him under threat of foreclosure, and failing to properly apply those payments, thereby making it impossible for him to properly pay down the debt he owed. (*See* 3d Am. Compl. ¶¶ 7-13.) Plaintiff's evidence,

however, goes only to a purported scheme involving one victim (Dolan and his wife), the servicing of a single mortgage, and limited perpetrators, with a single and finite goal. Such evidence is insufficient to demonstrate the presence of closed-ended continuity.

For the reasons set forth above, the Court concludes that plaintiff has failed to proffer evidence sufficient to raise a genuine question of fact as to the existence of a pattern of racketeering activity. The absence of such a pattern of racketeering activity is fatal to plaintiff's RICO claim and, as such, FCC's motion for summary judgment as to that claim is granted.

### B.    As to PMI

Plaintiff appears to assert that due to the corporate relationship between PMI and FCC, PMI "benefitted" from FCC's racketeering activity. (*See* Pl.'s Opp'n at ¶ 18.) As discussed above, however, plaintiff has failed to point to sufficient record evidence to raise a genuine issue of material fact as to whether FCC engaged in racketeering activity. Accordingly, plaintiff cannot demonstrate that PMI "benefitted" from that alleged racketeering activity.

Alternatively, plaintiff has failed to set forth a sufficient basis for holding PMI liable for any actions of FCC. Plaintiff appears to rely on the existence of a corporate relationship between PMI and FCC's parent company as a basis for PMI's liability under RICO. (*See* Pl.'s Opp'n at ¶ 18(b).) Specifically, between 2000 and 2005, PMI held an investment interest in FCC's parent company, FCHC. (Decl. of Bradley M. Shuster, dated May 16, 2011 ("Shuster Decl.") ¶¶ 7, 10.) PMI asserts that although it owned a 56.8% stake in FCHC as of mid-2002, it never had either the right to control the operations of FCHC or the power to appoint more than two members to FCHC's nine-member board of directors. (*Id.* ¶¶ 7-10.) Additionally, PMI contends never had the power to control the day-to-day activities of either FCHC or FCC. (*Id.* ¶ 11.) Plaintiff does

20

not dispute either of these assertions.

Generally, "a corporate relationship alone is not sufficient to bind a parent corporation for the acts of its subsidiary." *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69 (2d Cir. 1996) (internal quotation marks and alterations omitted). "Indeed, ownership by a parent of all its subsidiary's stock has been held an insufficient reason in and of itself to disregard distinct corporate entities." *Id.* (internal quotation marks and alteration omitted). "To overcome the presumption of separateness afforded to related corporations," plaintiff must "come forward with [a] showing of actual domination." *Id.* at 70 (internal quotation marks omitted). Plaintiff has failed to make that showing in this case. At most, he has pointed to evidence that PMI owned a majority share of FCHC's stock between 2002 and 2005, but this alone is insufficient "to disregard distinct corporate entities." *Id.* at 69 (finding parent company was an improper defendant in an action alleging its subsidiary engaged in RICO violations). Plaintiff has failed to produce any other evidence that might indicate that PMI was "the mere alter ego" of FCHC or FCC, such as "the absence of the formalities and paraphernalia that are part and parcel of corporate existence, i.e., issuance of stock, election of directors, [and] keeping of corporate records," "overlap in ownership, officers, directors, and personnel," or "common office space, address and telephone numbers of corporate entities." *In re Vebeliunas*, 332 F.3d 85, 90 n.3 (2d Cir. 2003).

Accordingly, PMI's motion for summary judgment as to plaintiff's RICO claim against it is granted.

### III. *Plaintiff's RICO Conspiracy Claims Against FCC and PMI are Dismissed*

Section 1962(d) makes it unlawful "to conspire to violate any of the provisions of

subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). A "RICO conspiracy requires evidence that [a defendant] participated in the enterprise through a pattern of racketeering activity, or agreed to do so." *United States v. Tellier*, 83 F.3d 578, 581 (2d Cir. 1996). Because, as discussed above, plaintiff has failed to come forward with evidence sufficient to raise a question of fact as to whether a pattern of racketeering activity existed, his RICO conspiracy claim also must be dismissed. *See Spool*, 520 F.3d at 183 (noting that "to establish a RICO conspiracy, a plaintiff must show a conspiracy to commit a substantive RICO violation"); *FD Property Holding*, 206 F. Supp. 2d at 373 ("Because the RICO conspiracy claim is dependent upon the Section 1962(c) RICO claim, dismissal of that claim mandates the dismissal of the RICO conspiracy claim.") (collecting cases); *Shamis*, 1997 WL 473577 at *17 (dismissing RICO conspiracy claim because "the predicate acts alleged by Shamis do not amount to a "pattern of racketeering activity" under RICO").

Thus, the motions by FCC and PMI seeking summary judgment as to plaintiff's RICO conspiracy claims are granted.

## IV. *Plaintiff's Antitrust Claims Against FCC and PMI are Dismissed*

Plaintiff alleges that FCC and PMI "used anti-competitive practices and conspired to monopolize and control the sub-prime mortgages servicing in an industry where these companies had substantial market-share." (2d Am. Compl. ¶ 15.) Section 2 of the Sherman Act prohibits monopolization, attempted monopolization and conspiracy to monopolize. 15 U.S.C. § 2. To establish a monopolization claim, a plaintiff must show: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business

acumen, or historic accident." *Pepsico, Inc. v. The Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (internal quotation marks omitted). "To state an attempted monopolization claim, a plaintiff must establish '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Id.* (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). The term "monopoly power" is defined as "'the power to control prices or exclude competition . . . in the relevant market.'" *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 791 n.3 (2d Cir. 1987) (quoting *Broadway Delivery Corp. v. United Parcel Serv., Inc.*, 651 F.2d 122, 126-27 (2d Cir. 1981)). Here, plaintiff has failed to proffer any evidence that either FCC or PMI had (or had a dangerous probably of achieving) monopoly power, i.e., the power to control prices or exclude competition in the sub-prime mortgage servicing market. Thus, his monopolization claims are deficient as a matter of law.

Plaintiff also asserts that PMI and FCC entered into an unlawful tying arrangement. Specifically, plaintiff alleges that:

> PMI [ ] participated in a tie-in sale and overcharge scheme using force-placed insurance . . . PMI provided coverage when FCC did not pay insurance premiums and intentionally lapsed and replaced existing coverage. PMI provided the added coverage on alleged arrears directly or through subsidiaries. PMI benefitted from income generated by schemes and re-invested the profits earned from the conspiracy back into the enterprise. FCC combined the original mortgage loan amount with the fabricated arrears and added on more force-placed insurance coverage to cover the fabricated overall arrears amounts, increasing insurance premium charges, driving up illegally the costs to homeowners such as Dolan.

(2d Am. Compl. ¶ 89.)

A typical tying arrangement is "an agreement by a party to sell one (tying) product but

only on the condition that the buyer also purchases a different (or tied) product." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 461 (1992) (internal citation and quotation marks omitted). The Supreme Court has explained that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds, Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006).

Both FCC and PMI assert that plaintiff's tying claim must be dismissed because, *inter alia*, plaintiff has failed to show that PMI sold plaintiff (or force-placed upon him) any insurance policy at all. Indeed, the undisputed evidence on the record demonstrates that PMI "does not write or sell hazard insurance and, therefore, did not sell any hazard insurance to Mr. Dolan, his lender or to anyone to cover his property." (Shuster Decl. ¶ 4.) PMI does, however, sell "private mortgage insurance to residential mortgage lenders and investors," and its "customers are mortgage banks, savings institutions, commercial banks, and other mortgage lenders." (*Id.* ¶ 2.)[12] PMI acknowledged that a lender that purchases private mortgage insurance from PMI may choose to "pass the cost of insuring itself against borrower default to the borrower." (*Id.* ¶ 6.) Plaintiff has failed, however, to proffer any evidence that PMI sold private mortgage insurance to FCC in the first instance, or that FCC then passed such a cost on to plaintiff. Even if plaintiff

---

[12] According to PMI, "[p]rivate mortgage insurance protects mortgage lenders against losses in the event of borrower default." (Shuster Decl. ¶ 3.)

could point to such evidence, thereby establishing that he was an indirect purchaser of PMI's insurance, his claim would still be barred because "[g]enerally, only direct purchasers have standing to bring civil antitrust claims." *Simon v. KeySpan Corp.*, 694 F.3d 196, 201-02 (2d Cir. 2012) (citing *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 730-31 (1977)).

Plaintiff also alleges that FCC used its "predatory loan servicing practices" to negatively impact his credit rating, which, in turn, "crushed your ability to insure your home with a reasonabl[y] priced homeowner's policy." (Pl.'s Opp'n at unnumbered pages 7-8.) According to plaintiff, FCC "used this leverage to knock off existing policies and replace [them] with policies from Balboa,"[13] receiving "kickbacks" in the process. (*Id.* at unnumbered page 8.) Plaintiff asserts that "[t]his tying scheme . . . allowed Defendants to disguise charges and stack additional fees used to accumulate the fabricated arrears." (*Id.*) Plaintiff cannot maintain a tying claim based on these allegations. First, plaintiff has failed to demonstrate that FCC ever sold him any product. It is undisputed that FCC only serviced plaintiff's loan, and did not serve as the lender or the holder of the note and mortgage. Moreover, plaintiff has not pointed to any documentary evidence that any insurance policy issued by "Balboa" was ever "force-placed" on his account during the time that FCC serviced his loan.

Accordingly, plaintiff's antitrust claims against FCC and PMI are dismissed.

## V. *Plaintiff's FDCPA Claims Against FCC*

Plaintiff claims that FCC violated the FDCPA by falsely representing the character, amount or legal status of his debt, wrongfully threatening to foreclose, and communicating false credit information to credit reporting agencies. (*See* 3d Am. Compl. ¶ 7 (alleging that FCC did

---

[13]     It is unclear from the record what "Balboa" refers to.

not apply plaintiff's November 2000 payment until January 2001 and never applied plaintiff's

December 2000 payment to the mortgage or real estate taxes, thereby creating the false

impression that he was in arrears); ¶¶ 7, 8 (demanding payment for false arrears and threatening

foreclosure); ¶ 39 (reporting false arrears to credit reporting agencies).)

"Congress designed the FDCPA 'to eliminate abusive debt collection practices by debt

collectors . . . .'" *Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 85 (2d Cir. 2003)

(quoting 15 U.S.C. § 1692(e) (1997)). FCC argues that it is not a "debt collector" as that term is

defined in the FDCPA. (FCC's Mem. at 12.) The statute defines "debt collector" as:

> [A]ny person who uses any instrumentality of interstate commerce or
> the mails in any business the principal purpose of which is the
> collection of any debts, or who regularly collects or attempts to
> collect, directly or indirectly, debts owed or due or asserted to be
> owed or due another . . . .

15 U.S.C. § 1692a(6). There are, however, a number of exceptions to this statutory definition,

including "any person collecting or attempting to collect any debt owed or due or asserted to be

owed or due another to the extent such activity . . . (iii) concerns a debt which was not in default

at the time it was obtained by such person . . . ." 15 U.S.C. § 1692a(6)(F). FCC argues that

when it acquired servicing rights to plaintiff's mortgage on November 22, 2000, plaintiff had

already entered into the August 2000 Forbearance Agreement, and was not in default of that

agreement. (FCC's Mem. at 13-14.) As such, FCC concludes, because plaintiff's debt was not

in default at the time it obtained servicing rights, FCC does not fall within the statutory definition

of "debt collector." (*Id.*)

FCC relies on the Seventh Circuit's decision in *Bailey v. Security National Servicing

Corp.*, 154 F.3d 384 (7th Cir. 1998). In that case, the plaintiffs had fallen behind on their

mortgage payments and went into default in 1991. *Id.* at 386. Between 1992 and 1995, the

plaintiffs "entered into a series of payment plans, or forbearance agreements" with HUD (the

holder of the note and mortgage). *Id.* Each forbearance agreement "stated that while the

'original note' remained in default, the forbearance agreement 'temporarily supersede[d]' it." *Id.*

In late 1995, HUD sold a portfolio containing the plaintiff's loan (along with 2,000 other loans)

to BCGS, LLC, which then hired the defendants to service the loans. *Id.* The plaintiffs claimed

that a letter sent by defendants on January 4, 1996 did not comply with certain FDCPA

requirements, and the defendants moved for summary judgment arguing that they were not "debt

collectors" under the statute. *Id.*

    The Seventh Circuit began by noting that the "plain language" of the statute means "that

an individual is not a 'debt collector' subject to the Act if the debt he seeks to collect was not in

default at the time he purchased (or otherwise obtained) it." *Id.* at 387. While the plaintiffs had

defaulted on their original note, that note had been "superseded by a renegotiated payment plan

executed with HUD." *Id.* The Seventh Circuit continued that the defendants had "sought to

collect the debt under the forbearance agreement, which both parties agree[d] was not in arrears

at the time the defendants obtained it," and so "[b]ecause the debt under the forbearance

agreement . . . was not in default" at the time the defendants obtained it, they were not debt

collectors within the meaning of the statute. *Id.* at 388. The Court agrees with the reasoning of

the Seventh Circuit on this point, which is set forth as follows:

> [I]f we did not make this common-sense distinction between
> defaulted agreements and superseding agreements not in default, we
> would be ignoring the terms and the parties' undoubted purpose
> behind the new payment plans by saying that a debtor in default can
> never have his slate wiped clean or [be] given a last chance to become

> credit-worthy under a new plan. We would also be saying that a mortgage servicer . . . is a debt collector that is subject to the hypertechnical requirements of the Act no matter how far down the line it is hired to service a debt that superseded a debt previously in default (perhaps many years earlier as mortgages typically last that long).

*Id.* at 387.

Here, as of November 22, 2000 when FCC began servicing plaintiff's mortgage, the August 2000 Forbearance Agreement was in effect. That agreement noted that the original loan was in default, (Bhimani Decl., Ex. D at ¶ B), but that TMS was agreeing "to hold the foreclosure in abeyance" pending plaintiff's compliance with a new payment schedule. (*Id.* ¶ C.) There is no evidence that plaintiff had defaulted on his obligations under the August 2000 Forbearance Agreement as of November 22, 2000.[14] (*See* 2d Am. Compl., Ex. 1, Doc. 2 (evidencing that plaintiff submitted his required monthly payment for October 2000 to TMS).) Thus, following the rationale of the Seventh Circuit in *Bailey*, the Court concludes that the relevant debt is the debt plaintiff owed pursuant to the August 2000 Forbearance Agreement and because plaintiff was not in default of that debt as of November 22, 2000, FCC is not a "debt collector" within the meaning of the FDCPA. *See Bailey*, 154 F.3d at 388; *see also De Dios v. Int'l Realty & Investments*, 641 F.3d 1071, 1073-75 (9th Cir. 2011) (finding defendant was not a "debt collector" when it acquired servicing rights to the debt – accrued and unpaid rental payments – after the tenant and landlord had entered into a stipulated forbearance, pursuant to which the landlord agreed "not to file an unlawful detainer action if [the plaintiff] continued to pay the pre-

---

[14] Although plaintiff may have defaulted on his obligations under the August 2000 Forbearance Agreement at some point *after* November 22, 2000, the relevant focus is when FCC acquired its servicing rights to the debt – not when it made attempts to collect on that debt. *See De Dios v. Int'l Realty & Investments*, 641 F.3d 1071, 1074 n.2 (9th Cir. 2011).

increase rent amount until there was a judicial ruling on the issue").

Because the FCC is exempt from the definition of a "debt collector," pursuant to 15 U.S.C. § 1692a(6)(F), plaintiff's FDCPA claim against FCC is dismissed.

## VI.    *Plaintiff's RESPA Claims Against FCC*

The purpose of RESPA is to ensure "that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country."  12 U.S.C. § 2601(a).  Plaintiff asserts that FCC violated RESPA by "failing to meet the [statutory] requirements . . . regarding transfer of servicing and responding to qualified written requests," in violation of 12 U.S.C. § 2605, and by "failing to meet the [statutory] requirements . . . regarding escrow account statements, collection of escrow and notification of shortage in escrow account[s]," in violation of 12 U.S.C. § 2609. (2d Am. Compl. ¶¶ 216, 217.)

### A.    *Section 2605*

FCC argues that it complied with its obligations under Section 2605(b) of RESPA, which requires "[e]ach servicer of any federally related mortgage loan [to] notify the borrower in writing of any assignment, sale, or transfer of the servicing of the loan to any other person."  12 U.S.C. § 2605(b).  Specifically, FCC notified plaintiff by letter dated June 13, 2003 that the servicing rights to plaintiff's loan were transferred from it to Wilshire.  (FCC's Mem. at 15; *see also* Bhimani Decl., Ex. J.)  An examination of the June 13, 2003 letter, however, does not readily reveal the presence of certain information required by Section 2605(b), to wit, "[a]ny information concerning the effect the transfer may have, if any, on the terms of or the continued

29

availability of mortgage life or disability insurance or any other type of optional insurance and what action, if any, the borrower must take to maintain coverage," and "[a] statement that the assignment, sale, or transfer of the servicing of the mortgage loan does not affect any term or condition of the security instruments other than terms directly related to the servicing of such loan." *See* 12 U.S.C. § 2605(b)(3)(F) & (G). Thus, FCC has not established its entitlement to summary judgment on plaintiff's claim under Section 2605(b) of RESPA.

FCC also asserts that there is no question of material fact regarding its compliance with Section 2605(c) of RESPA, which requires "[e]ach transferee servicer to whom the servicing of a federally related mortgage loan is assigned, sold, or transferred [to] notify the borrower of any such assignment, sale, or transfer." 12 U.S.C. § 2605(c)(1). FCC asserts that its "records indicate that when the loan servicing rights to Plaintiff's loan were transferred to [FCC], [it] notified Plaintiff by letter dated December 6, 2000. (FCC's Mem. at 15; *see also* Bhimani Decl., Ex. L.) The record cited by FCC purports to be "an excerpt of [FCC's] contact history with Plaintiff." (Bhimani Decl. ¶ 15 & Ex. L.) This "excerpt" indicates that: "Hello Letters sent 12/06/00. A copy is available via Online Letter Writer in MSP. Loans transferred effective 11/22/00. The Prior Servicer Information is: HomeEq-The Money Store 4837 Watt Ave. Suite 200 North Highlands, CA 95660 Customer Service Telephone Number: 1-877-867-7378 6:00am-6:00pm PST M-F." (Bhimani Decl., Ex. L.)

Unfortunately, this document raises more factual questions than it resolves. FCC has provided no information from an individual with first-hand knowledge regarding who created this document, when it was created, how it was maintained, whether it actually refers to plaintiff's account, and who made the "NOTE" for December 6, 2000, which contains the

language quoted above.  Furthermore, FCC has not supplied the Court with a copy of the "Hello Letters" purportedly sent to plaintiff on December 6, 2000, and the Court cannot determine from the information provided by FCC whether that letter (assuming it was actually sent to plaintiff) did, in fact, comply with the requirements set forth in Section 2605(c).  Thus, FCC has not established its entitlement to summary judgment on plaintiff's claim under Section 2605(c) of RESPA.

Plaintiff also asserts a claim pursuant to Section 2605(e) of RESPA.  (*See* 2d Am. Compl. ¶ 216.)  That provision sets forth requirements regarding a loan servicer's duty to respond to a borrower's "qualified written request . . . for information relating to the servicing of [a] loan . . . ."  12 U.S.C. § 2605(e).  FCC asserts that plaintiff "has failed to identify a qualified written request that meets the requirements of RESPA that was not acknowledged by [FCC] or to which [FCC] did not respond."  (FCC's Mem. at 16.)  The record shows, however, that plaintiff is asserting that he made qualified written requests on December 18, 2000 (2d Am. Compl., Ex. II, Doc. 7), and February 16, 2001 (*id.*, Ex. III, Doc. 10).  Plaintiff further alleges that FCC failed to respond to his first request and that its response to his second request (*see id.*, Ex. III, Doc. 11) was insufficient.  Because FCC has not addressed the substance of these claims, it is not entitled to summary judgment as to them.

Accordingly, FCC's motion for summary judgment as to plaintiff's claims under 12 U.S.C. § 2605(b), (c), and (e) is denied.

### B.     *Section 2609*

RESPA states that a lender may not require a borrower

    to deposit in any escrow account which may be established in

31

> connection with such loan for the purpose of assuring payment of taxes, insurance premiums, or other charges with respect to the property, in connection with the settlement, an aggregate sum (for such purpose) in excess of a sum that will be sufficient to pay such taxes, insurance premiums and other charges . . . .

12 U.S.C. § 2609(a)(1).  RESPA obligates a loan servicer to "notify the borrower not less than annually of any shortage of funds in the escrow account."  12 U.S.C. § 2609(b).

Plaintiff asserts that FCC violated Section 2609 when it "did not apply Plaintiff's December 2000 payment to the mortgage or pay the real estate taxes due December 1, 2000 and failed to notify Plaintiff."  (3d Am. Compl. ¶ 7.)  Instead of receiving notification from FCC of a shortage of funds in his escrow account (from which, presumably, his real estate taxes should have been paid), he learned from the Town of Smithtown that his real estate taxes were delinquent.  (*See* 2d Am. Compl., Ex. III, Doc. 9.)

FCC asserts that this claim must be dismissed because "there is no private right of action under § 2609."  (FCC's Mem. at 17.)  The Second Circuit has not addressed the question of whether a private right of action exists under Section 2609 of RESPA.  *See Johnson v. Washington Mut. Bank, F.A.*, 216 Fed. Appx. 64, *1 (2d Cir. Feb. 2, 2007) (unpublished).  This Court, however, agrees with the reasoning of other courts within this Circuit that have concluded that there is no private right of action under that statutory provision.  *See Johnson v. Scala*, 2007 WL 2852758, at *5 (S.D.N.Y. Oct. 1, 2007); *McAnaney v. Astoria Fin. Corp.*, 357 F. Supp. 2d 578, 591 (E.D.N.Y. 2005).  First, RESPA explicitly sets forth statutes of limitations for claims brought pursuant to Sections 2605, 2607, and 2608.  12 U.S.C. § 2614.  "Had Congress intended to create a private right of action under § 2609, that section also would have been included in the statute of limitations section."  *McAnaney*, 357 F. Supp. 2d at 591.  Additionally, "Congress

amended the escrow section of RESPA after the circuit courts had decided that no private right of action existed and only provided for an administrative remedy under § 2609(c)." *Id.* (citing *State of La. v. Litton Mortgage Co.*, 50 F.3d 1298, 1301 (5th Cir. 1995)).

Accordingly, FCC's motion for summary judgment as to plaintiff's claim under Section 2609 of RESPA is granted, and that claim is dismissed.

## VII.    *Plaintiff's TILA Claims Against FCC*

TILA requires creditors to clearly and accurately disclose all the material terms of a credit transaction. *See Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998). Plaintiff alleges that FCC violated TILA and its accompanying regulations by failing to accurately state his loan balance in its variable rate adjustment disclosure. (2d Am. Compl. ¶¶ 221-24 (citing 12 C.F.R. § 226.20(c).) FCC alleges that TILA "specifically exempts servicers" from liability. (FCC's Mem. at 17.)

TILA provides that "[a] servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as an assignee of such obligation for purposes of this section unless the servicer is or was the owner of the obligation." 15 U.S.C. § 1641(f)(1). Here, plaintiff has proffered no evidence that FCC ever was the owner of plaintiff's debt. Thus, he may not maintain TILA claims against FCC. *See Thrane v. Litton Loan Servicing LP*, 2009 U.S. Dist. LEXIS 126481, at *5 (E.D.N.Y. Oct. 27, 2009) (dismissing TILA claim against mortgage loan servicer when it was "not now and has never been an assignee of the [ ] loan"); *Blaize-Sampeur v. McDowell*, 2006 WL 3903957, at *3 n.4 (E.D.N.Y. Oct. 18, 2006) (finding TILA did not apply to loan servicing company).

Thus, FCC's motion seeking summary judgment as to plaintiff's TILA claim is granted

33

and that claim is dismissed.

## VIII. Plaintiff's State Law Claims

### A. New York General Business Law § 349

Plaintiff also asserts that FCC engaged in "unfair and/or deceptive acts and practices" in violation of state law. (2d Am. Compl. ¶ 229.) New York General Business Law ("GBL") § 349 prohibits "[d]eceptive acts or practices in the conduct of any business . . . ." N.Y. Gen. Bus. L. § 349(a). To state a claim for relief under that statute, a plaintiff must demonstrate: "(1) that the defendant's conduct is 'consumer-oriented'; (2) that the defendant is engaged in a 'deceptive act or practice'; and (3) that the plaintiff was injured by this practice." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010). FCC does not dispute that its conduct is "consumer-oriented," but asserts that plaintiff has not proffered evidence sufficient to raise an issue of fact regarding whether it engaged in a "deceptive act or practice" and whether plaintiff suffered injury as a result. (*See* FCC's Mem. at 18.)

The Court disagrees. First, plaintiff has submitted evidence that he made monthly payments (of varying amounts) to FCC for almost the entire period between November 2000 and July 2001 pursuant to the August 2000 Forbearance Agreement. (3d Am. Compl., Ex. 2.) Plaintiff claims that certain of those payments were not appropriately applied to his account, thereby resulting in his being required to enter into the September 2002 Forbearance Agreement and being subjected to foreclosure proceedings. FCC submits a document purporting to be a "Key Loan Transaction summary for Plaintiff's mortgage loan" (*see* Bhimani Decl. ¶ 11 & Ex. H) as support for its position that plaintiff's claim is inaccurate. However, this document is attached to FCC's counsel's declaration, and the Court has been provided with no information

from anyone with first-hand knowledge as to exactly what this document is, who created it, how it was maintained, and what it purports to show. Thus, it is impossible for the Court to conclude based on this document alone that no reasonable juror could find that plaintiff's payments were not properly credited to his account. Indeed, the fact that foreclosure proceedings were commenced against plaintiff on the grounds that he had "failed to make and pay the installment of principal and interest due and owing on October 17, 2000 and thereafter," (Bhimani Decl., Ex. F at ¶ 7), indicates the presence of a question of fact given plaintiff's evidence that he did, in fact, make payments between November 2000 and July 2001.

Additionally, plaintiff claims that the only reason he was required to enter into the September 2002 Forbearance Agreement was his inability to catch up on his debt, and that this inability was caused by FCC's failure to properly credit his account with the payments he made pursuant to the August 2000 Forbearance Agreement. According to plaintiff, not only did FCC fail to properly credit his made pursuant to the August 2000 Forbearance Agreement, FCC's actions caused his arrears to increase to $87,567.71. The documentation submitted by FCC is not sufficient to warrant summary judgment dismissing this claim.

Plaintiff contends that he was further damaged by, *inter alia*, making the required $15,000 down payment under the September 2002 Forbearance Agreement (Bhimani Decl., Ex. K at ¶ 9 and Ex. M at 1; 3d Am. Compl., Ex. 6) – an agreement that, as noted above, he claims that he would never have entered into but for FCC's wrongful conduct. FCC asserts that "there is no evidence Plaintiff was damaged by paying $15,000 in purported false arrears" because the $15,000 was later applied by Wilshire "directly to the unpaid principal balance, even though application to principal and interest was appropriate." (FCC's Mem. at 18-19 (citing Bhimani

Decl., Ex. K).) The Court notes that Wilshire applied the $15,000 to the unpaid principal only after receiving JHO Willen's April 2005 decision, in which he sharply criticized the forbearance agreements and FCC's practices, and determined that nothing in the record before him supported FCC's assertion that plaintiff owed more than $87,000 in arrears. (*See id.*) Thus, approximately two and one-half years had passed between the time that plaintiff made the $15,000 down payment pursuant to the September 2002 Forbearance Agreement (an agreement he asserts he would not have had to enter into but for FCC's wrongful refusal to properly apply his payments to his debt) and Wilshire's application of that payment to his unpaid principal balance. FCC asserts, in a rather cavalier manner, that plaintiff was not damaged by virtue of making this $15,000 payment in September 2002 because he was merely "ma[king] a payment toward a contractually owed debt." (*See* FCC's Mem. at 8.) Given the sequence of events described above, the Court is not persuaded by this assertion.

For the reasons set forth above, FCC's motion for summary judgment as to plaintiff's claim pursuant to Section 349 of the GBL is denied.

### B. *Breach of Contract, Breach of the Implied Duty of Good Faith and Fair Dealing, and Unjust Enrichment Claims*

For the reasons articulated above, plaintiff has proffered sufficient evidence to raise a question of fact as to whether FCC breached the forbearance agreements by failing to properly credit payments made by plaintiff to his account. FCC's argument that plaintiff failed to "demonstrate that he adequately performed his obligations under either forbearance agreement" (FCC's Mem. at 19) ignores plaintiff's assertion that the amount of his arrears was improperly inflated due to FCC's failure to properly credit his account. Thus, FCC's motion for summary

36

judgment as to plaintiff's breach of contract claims is denied.

Plaintiff may not, however, recover under a theory of unjust enrichment, (*see* 2d Am. Compl. ¶¶ 297-303), when "valid and enforceable" contracts, i.e., the forbearance agreements, "govern[ ] the particular subject matter of this case." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006). Similarly, "New York law will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when it arises from the same allegations as a breach of contract claim." *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 652 (E.D.N.Y. 2012) (citing *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 70 A.D.3d 423 (1st Dep't 2010)). Here, plaintiff has failed to refute FCC's assertion that these claims are duplicative of his breach of contract claims. Accordingly, FCC's motion for summary judgment dismissing plaintiff's unjust enrichment and breach of the implied duty of good faith and fair dealing claims is granted.

## C.     *Intentional Misrepresentation*

Plaintiff's claim for relief based on a theory of "Intentional Misrepresentation" (2d Am. Compl. ¶¶ 259-266) is more accurately framed as a cause of action for fraud under New York law. *See Chen v. United States*, 854 F.2d 622, 628 (2d Cir. 1988) ("These allegations clearly constitute an action for intentional misrepresentation (called 'fraud' in New York) . . . ."). To maintain a fraud claim under New York law, a plaintiff must show: "'(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damages as a result of such reliance.'" *Nwagboli v. Teamwork Transp. Corp.*, 2009 WL 4797777, at *5

(S.D.N.Y. Dec. 7, 2009) (quoting *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)).

A fraud claim "cannot exist" when it "arises out of the same facts as a breach of contract claim with the sole additional allegation that the defendant never intended to fulfill its express contractual obligations." *Id.* (internal quotation marks omitted). The "critical question" in determining whether a plaintiff may maintain separate fraud and breach of contract claims "is whether the alleged misrepresentation was collateral or extraneous to the contract in question." *Id.* (internal quotation marks omitted). Here, the alleged misrepresentation – that FCC was "entitled to collect various loan charges that were not legally due and owing" (2d Am. Compl. ¶ 260) – was not "collateral or extraneous" to the forbearance agreements but, instead, "goes to the heart of the contract[s] between the parties." *Nwagboli*, 2009 WL 4797777 at *5.

Accordingly, FCC's motion for summary judgment dismissing plaintiff's intentional misrepresentation/fraud claim is granted.

### D.    *Negligence*

Plaintiff also asserts a negligence claim against FCC, alleging that FCC breached "a duty of care with respect to servicing [his] mortgage loans . . . ." (2d Am. Compl. ¶¶ 276-80.) FCC asserts that plaintiff's negligence claim "fails as a matter of law as [FCC] owes no duty to the Plaintiff, other than the aforementioned contractual duties set forth in the forbearance agreements, Note, and Mortgage." (FCC's Mem. at 22.) As support for this proposition, FCC cites *Griffin v. American Home Mortgage Servicing*, 2010 WL 3928610, at *3 (Bankr. S.D.N.Y. Aug. 31, 2010), which involved a bankruptcy adversary proceeding in which the plaintiff named his mortgage servicer as a defendant and asserted claims for breach of RESPA, breach of

38

contract, and negligence. There, the court reasoned that "to sustain a tort action for negligence, [the plaintiff] must assert more than a simple breach of contract: they must assert a legal duty that is independent of the contract that has been breached." *Id.* The court concluded that the plaintiff's complaint failed to set forth a "specific duty" owed to the plaintiff by the defendant "other than [the defendant's] responsibilities under [Section 2605(e) of] RESPA." *Id.* Because, however, the court concluded that the complaint did "not state a claim for violation of RESPA," it "also would not state a claim for negligence." *Id.*

Similarly, here, plaintiff has alleged that FCC owed him specific duties under RESPA – duties that are independent of any contractual duties that FCC might have owed plaintiff. Unlike in *Griffin*, however, the Court has concluded that genuine issues of material fact exist as to whether FCC breached the duties it owed to plaintiff under Section 2605 of RESPA. Accordingly, FCC's motion for summary judgment as to plaintiff's negligence claim is denied.

### E.    *Breach of Fiduciary Duty*

Plaintiff alleges that FCC "assumed fiduciary duties with respect to monies it held in escrow for Plaintiff" and breached those fiduciary duties "by failing to making timely tax payments from escrowed funds," and "by failing to timely process or account for escrow funds." (2d Am. Compl. ¶¶ 287-89.) FCC asserts that "the use of escrow funds is governed by the terms [of the] Note and Mortgage" and plaintiff has failed to show that FCC "has an independent duty to manage said funds outside of the duties imposed by these agreements." (FCC's Mem. at 23.) FCC accurately cites *Gorham-Dimaggio v. Countrywide Home Loans, Inc.*, 592 F. Supp. 2d 283, 294 (N.D.N.Y. 2008) for the proposition that "absent specific contractual language or circumstances to the contrary, the ordinary relationship between a creditor and debtor does not

rise to the level of imposing a fiduciary duty upon the creditor." In that same opinion, however, the court noted that "the Second Department has previously found that a creditor has a fiduciary duty to make escrow payments on behalf of a debtor."[15] *Id.* (citing *Davis v. Dime Sav. Bank of N.Y.*, 158 A.D.2d 50, 53 (3d Dep't 1990)); *see also Casey v. Citibank, N.A.*, __ F. Supp. 2d __, 2013 WL 11901, at *8 (N.D.N.Y. Jan. 2, 2013) ("New York case law recognizes a fiduciary duty where specific language in the contract obligates a creditor to make payments out of an escrow account on behalf of the debtor.").

Here, the Mortgage obligates TMS – and, as FCC acknowledges, FCC "as agent for the holder of the note and Mortgage" (FCC's Mem. at 23) – to make specified payments, including tax payments, from the escrow funds. (Bhimani Decl., Ex. B at ¶ 2.) Contrary to FCC's assertions, this contractual language gives rise to a fiduciary duty. FCC has not otherwise addressed the merits of plaintiff's breach of fiduciary duty claim. Thus, FCC's motion for summary judgment as to this claim is denied.

### F.     *Plaintiff's Claim Under Other State Laws Regarding Prepayment Penalties*

Plaintiff alleges that FCC violated the laws of Massachusetts, Alabama, and West Virginia by charging him "prepayment penalties . . . that exceed the amount allowable" under those statutes. (2d Am. Compl. ¶¶ 269-73.) Plaintiff has not proffered any evidence that he has standing to assert claims under those statutes; he has not pointed to any evidence that he resided in any of those states, that any relevant events took place in those states, or that the laws of those states applied to the forbearance agreements, Note, or Mortgage. Thus, FCC's motion for

---

[15]     In *Gorham-Dimaggio*, plaintiff alleged that the defendant had breached a fiduciary duty by "providing inaccurate and misleading information," not by failing to make payments from the escrow account. *See* 592 F. Supp. 2d at 294.

summary judgment as to this claim is granted.

### *CONCLUSION*

For the reasons set forth above, PMI's motion for summary judgment is granted in its entirety, and all of plaintiff's claims against PMI are dismissed. FCC's motion for summary judgment is granted in part and denied in part. Each of plaintiff's claims against FCC is dismissed except his claims pursuant to Section 2605(b), (c), and (e) of RESPA and NY GBL § 349, and his state law claims for breach of contract, negligence, and breach of fiduciary duty.

Plaintiff and FCC are directed to contact Judge Tomlinson to schedule deadlines for submission of a Joint Pretrial Order and Pretrial Conference. Counsel for FCC is directed to serve a copy of this Memorandum & Order upon pro se plaintiff forthwith and file proof of service on ECF.

**SO ORDERED.**

Dated: Central Islip, New York
     March 13, 2013                                    _____/s/_____
                                               Denis R. Hurley
                                               Unites States District Judge